## WOODS v. McGRAW et al.

(Circuit Court of Appeals, Fourth Circuit.   February 5, 1904.)

No. 498.

1. VENDOR AND PURCHASER—CONSTRUCTION OF CONTRACT—OPTION TO PUR-
   CHASE.

   Defendant, who had sold land to plaintiff, and taken a trust deed se-
   curing purchase money, on default caused the land to be sold under a
   power of sale therein.   The place of sale was remote from railroad and
   telegraph, and the attorney and agent of plaintiff, who resided there, hav-
   ing received no instructions from him, sought to delay the sale by making
   objections to its regularity, the result being an agreement by which the
   objections were withdrawn, the land was sold, and bid in by defendant
   for the amount of the debt, and he gave the agent a paper signed by him,
   by which he agreed that plaintiff "may have 10 days in which to repay me
   the purchase money of land and $250 in full of costs, etc., and on payment
   of which I will resell land to him or cancel this sale."   Neither the attor-
   ney nor agent of plaintiff had authority to bind him by any contract.
   Held, that the instrument merely gave him an option to repurchase the
   land, and did not operate as an extension of time for him to redeem from
   the mortgage, or continue his indebtedness thereunder.

2. SAME—SPECIFIC ENFORCEMENT OF OPTION CONTRACT—TIME LIMIT.

   It being shown that defendant was in urgent need of money, and that
   the time fixed in the option was determined only after negotiation, and
   was longer than he desired, such time must be held of the essence of the
   contract, and a court of equity is not authorized to extend it by enforcing
   specific performance after the time has expired without any offer of per-
   formance by plaintiff.

Appeal from the Circuit Court of the United States for the Northern
District of West Virginia, at Parkersburg.

L. L. Lewis and Frank W. Christian (D. Harman, Robert A. Wat-
son, Christian & Christian, and Lewis & Cary, on briefs), for appel-
lant.

W. G. Mathews and C. W. Campbell (Melville D. Post, G. H. A.
Kunst, and Mollohan, McClintic & Mathews, on briefs), for appellees.

Before SIMONTON, Circuit Judge, and MORRIS and McDOW-
ELL, District Judges.

McDOWELL, District Judge.   On July 12, 1897, Samuel B. Woods,
appellant here and defendant below, conveyed to John T. McGraw a
tract of 1,000 acres of heavily timbered land in West Virginia.   The
purchase price was $8,500, to be paid one-third on delivery of the
deed, one-third in six months, and the balance in twelve months from
July 12, 1897, with interest on the deferred payments.   To secure the
deferred payments, McGraw executed on July 12, 1897, a deed of
trust to one Morgan, with power to sell on default in payment.   The
cash payment was not made promptly, and there was considerable de-
lay in payment of the sum due on January 12, 1898.   These delays,
even if considered as being to some extent excusable, embarrassed
and annoyed Woods very greatly.   Woods was so situated that he
needed the sums coming to him from this sale, and it was to him of
great importance that the payments be made punctually.   Before the

last payment, due July 12, 1898, was due, Woods commenced to urge McGraw to meet it punctually, and advised him of his intent to have the deed of trust promptly foreclosed if there were a default. In fact, a sale under the deed of trust, advertised for a date earlier than the sale hereinafter mentioned, was intended; but because of some informality in the notices it was not held. Some time prior to August 10, 1898, Woods wrote McGraw, stating the amount due, and advising him that a sale of the land under the deed of trust would be held at Marlinton, W. Va., on August 13, 1898, unless the amount due were paid on or before said last-mentioned date. This letter advised McGraw that a remittance, to reach Woods in Charlottesville, Va., his home, before his departure for Marlinton (which is, or then was, some 40 miles from a railroad, and not reached by telegraph or telephone), must reach Charlottesville not later than August 10, 1898. Nothing having been heard from McGraw, Woods left Charlottesville for Marlinton on the night of the 10th. McGraw, who had previously received the above communication from Woods, telegraphed both to Woods and to a bank in Charlottesville on August 11th and 12th that he would pay the debt. Receiving no answer, McGraw then telegraphed his agents at Marlinton that he wished to pay the debt, but these messages were not delivered until after the transactions of August 13th, to be mentioned later, and until after Woods had left Marlinton.

At Marlinton, McGraw's agent was Yeager, and his attorney was McClintic. When the trustee, on the 13th of August, at Marlinton, started to cry off the land under the deed of trust, McGraw's agents— who had heard nothing from McGraw, and did not even know whether he wished to pay the debt and save the land or not—could think of nothing to do except to forbid the sale on the ground that the trustee had not conformed to a statute of West Virginia requiring trustees to give bond before making sales. This interruption led to the making of an agreement, the proper construction of which is warmly controverted. It reads:

I agree that John T. McGraw may have ten days in which to repay me the purchase money of land & two hundred & fifty dollars in full costs, etc., & on payment of which I will resell land to him or cancel this sale to-day & all trust deeds on said tract for my benefit. Sam'l B. Woods.
Aug't 13th, '98.
The land was to-day bought by me at........................ $3,045  00
250  00
————————
$3,295  00

Another draft of this agreement, being the one kept by Woods, was signed by Yeager as agent for McGraw; but it does not otherwise differ from the above. The facts concerning this paper will be somewhat more fully stated later on. The agreement which is set out in this paper having been reached, the demand for the bond was withdrawn, the sale was resumed, and the land was bought by Woods at the price of $3,045, which covers the debt and interest, and in part the trustee's commission. After the sale the agreement was reduced to writing and signed.

McGraw, as is contended, failed to observe the terms of this agreement of August 13th, and Woods, on August 25th, made another of-

fer to sell the land to him at the price named in the said agreement and an additional $250. This was never accepted by McGraw. After considerable delay, the cause of which it will be unnecessary to consider, McGraw filed a bill in equity, praying in the alternative that the trustee's sale made to Woods on August 13th be annulled, or that the agreement of that date be enforced. The decree of the trial court was in favor of McGraw, and Woods appeals therefrom.

We think it unnecessary to expend many words on the contention of the appellant that the decree appealed from is one enforcing the offer made by Woods on August 25th, and which McGraw never accepted. The foundation for such idea, which is otherwise fully rebutted by the decree itself, is that the decree requires McGraw to pay $250 more than the amount named in the agreement of August 13th (which we shall hereafter describe as the "Yeager" agreement). Of this McGraw is not complaining, and, if there be error herein, Woods is not injured thereby.

The contention made in the bill that the sale held on August 13th was invalid for want of due advertisement has been abandoned. The objection that the trustee gave no bond was distinctly waived, and the demand therefor withdrawn, after the Yeager agreement was reached, and before the land was bid in by Woods.

The first question to be decided is whether or not the Yeager agreement is an option given by Woods to McGraw to purchase, or repurchase, the land; or, in effect, an extension of time for the payment of the debt. It is earnestly urged that the true intent was that the trustee's sale should be regarded as a mere form, that the deed then forthwith to be made by the trustee to Woods should be treated as a mortgage securing the debt and the additional $250, and that McGraw's equity of redemption was simply extended. We think that the true intent of the Yeager agreement was that McGraw should have an optional right for 10 days to again purchase the land at the price named. The language of the paper itself admits of no other construction. McGraw is given 10 days in which to "repay" the purchase money Woods was then about to bid for the land. On payment Woods was to "resell" the land to McGraw. The language "or cancel this sale to-day" simply states a method—an expeditious, but very slovenly and improper one—by which title would on the records be made to appear to be again in McGraw. To speak of this agreement as an extension of McGraw's time of redemption is to use inapt and inaccurate language. It gave him the option of paying a sum of money and having the land. If at the end of the time given he had not paid the money, there could not, under this agreement, have been any possible obligation on him to pay anything. If he elected not to exercise this option, there was nothing said, or done, or contemplated at the time of the agreement by reason of which Woods could continue to treat McGraw as his debtor. If, for instance, the timber had been destroyed by fire, on what ground Woods could contend that McGraw still owed the debt we cannot conceive. Mr. McClintic's testimony shows beyond question that the intent was that McGraw should have the right, if he wished, to repurchase the land within 10 days. Yeager, it is true, uses the word "re-

deem," instead of "repurchase," in his testimony. But Yeager's language is "a chance to redeem." And even he does not intimate that McGraw was to remain bound as the debtor. The weight of testimony is that the value of this land was depressed in August, 1898, and that the prospects of a railroad being built—which had been good in 1897, and became so again in 1899—were at that time poor. Moreover, neither Yeager nor McClintic had had any instructions from McGraw. They did not know that he desired the land. They had no authority to agree that he should continue bound for the debt; and the paper itself, the testimony of the witnesses, and the surrounding circumstances, absolutely forbid a conclusion that any one present on August 13th intended more than that McGraw should have, if he wished it, an opportunity to again purchase the land. The agreement is necessarily to be construed as giving McGraw an option. It is unilateral. It imposes an obligation on Woods, and none on McGraw. If the obligation to pay the debt had been kept alive, a nicer question might have been raised. But we find nothing on which to base the idea that Woods and McGraw were to continue in the relation of creditor and debtor. It is a conceded fact that McGraw did not make payment or tender within the 10 days. We shall discuss the evidence on this point, and also the evidence as to the reason offered for the delay, later on.

From what has been said, it follows that we are not now concerned with the rule as to bilateral contracts of sale of land, but with that applicable to "option" contracts.

In Waterman v. Banks, 144 U. S. 394, 12 Sup. Ct. 646, 36 L. Ed. 479, the contract read, so far as is now material:

"* * * I hereby agree that at any time within twelve months from this date, upon demand of J. S. Waterman, * * * I will execute to him a good and sufficient deed of conveyance to an undivided twenty-four one-hundredths of the following mines. * * * R. W. Waterman."

No demand was made upon R. W. Waterman at any time within the 12 months. Says Mr. Justice Harlan, speaking of the above contract:

"It contains no word or clause indicating a purpose to create, as of its date, the relation of purchaser and vendor between him [J. S. Waterman] and R. W. Waterman. It gave the former * * * an option to demand a conveyance within a prescribed period, thus making time of the essence of the agreement. If a conveyance was not demanded within that period, the obligation of R. W. Waterman to make one ceased altogther. * * * The demand for a conveyance within a given time—looking alone at the writing—was made by the parties a condition precedent to the acquisition by J. S. Waterman of an interest in the property. R. W. Waterman did not agree to convey except upon the performance of that condition precedent. The condition being lawful, it is not competent for the court to dispense with its performance."

Then follow quotations to this same effect from Story, Eq. Jurisp. § 777a, Potts v. Whitehead, 20 N. J. Eq. 59, and Lord Ranelagh v. Melton, 2 D. & S. 281.

In Kelsey v. Crowther, 162 U. S. 408, 16 Sup. Ct. 810, 40 L. Ed. 1017, it is said that the rule as to performance within the time limit

is more stringently applied in cases of option sales, "where time is of the essence of the contract."

In Pomeroy on Contracts, the author states:

"Sec. 387. Where the contract is really an offer on one side, with a provision that the offer must be assented to and accepted, when a mere acceptance is contemplated, or payment must be made, when payment was the act of acceptance contemplated, at or before a specified date, then, of course, the act of assent or payment must be done within the prescribed time, and time is from the very form of the contract essential."

In 1 Pomeroy, Eq. Jurisp. (2d Ed.) § 455, it is said:

"It is well settled that where the parties have so stipulated as to make the time of payment of the essence of the contract within the view of equity as well as of the law, a court of equity cannot relieve a vendee who has made default. * * * It is also equally certain that when the contract is made to depend upon a condition precedent—in other words, when no right shall vest until certain acts have been done; as, for example, until the vendee has paid certain sums at certain specified times—then also a court of equity will not relieve the vendee against the forfeiture incurred by a breach of such condition precedent."

See, also, 22 Am. & Eng. Ency. (1st Ed.) notes, p. 1056.

In addition to the fact that the form of the contract makes time of the essence, we cannot escape the conclusion that the parties present at Marlinton on August 13th fully intended that the contract should be so construed. There was not only Woods' urgent need for money, and his obligations to be met, and his former annoying experiences with McGraw's delays in making payment; but the exact number of days to be allowed McGraw was a matter of dispute, finally fixed as stated in the agreement. Woods wanted $500 bonus and an option for only a week given McGraw. The latter's agents finally induced him to reduce the sum demanded to $250, and to extend the time to ten days. This is clearly not a case where the time of performance stated is merely a convenient one, where a reasonable delay would have been of no importance. Under the circumstances here, a court of equity has no right to extend the time.

In 3 Parsons, Contracts (7th Ed.) 340, it is said:

"But if it seems that * * * a material part of the value of the transaction to the defendant depends upon its being done at a certain time, * * * or that the substitution of any other will subject him in any way to loss or material inconvenience, then time is certainly of the essence of the contract, so far as he is concerned, and the court will so regard it."

See, also, 3 Pom. Eq. Jurisp. (2d Ed.) § 1408; Carter v. Phillips (Mass.) 10 N. E. 500; Kerr v. Hill, 27 W. Va. 577.

The time limit for payment by McGraw expired on August 23d. On that day the Grafton bank—a West Virginia bank, of which the cashier, C. R. Durbin, was McGraw's brother-in-law and agent—telegraphed the People's National Bank of Charlottesville, Va.: "We will forward to you $3,295, to be paid to Sam'l B. Woods, on account of Jno. T. McGraw. Kindly see Mr. Woods and wire us at once, and we will pay you for trouble." This telegram was not to Woods, and the bank to which it was sent was not his agent. On the day the option expired, not Woods, but an agent of McGraw's, is informed that another agent of McGraw's will forward the money. Why the request

was made that the Charlottesville bank people see Woods is not explained, but it seems as if it were a very natural effort to learn if Woods would accept the belated payment. On August 23d the Charlottesville bank—having no authority from Woods, and acting necessarily as McGraw's agent—telegraphed the Grafton bank: "Woods' whereabouts unknown; will return Thursday [August 25th]. We will follow instructions if you send money to us." On August 23d Mr. Durbin again telegraphed the cashier of the Charlottesville bank, "Will forward the amount to-morrow." But Mr. Durbin either changed his mind, and mailed the draft on the 23d, or he misdated the following letter, written to the Charlottesville bank, and dated August 23d: "In accordance with the above and a later telegram received from you, I enclose you our draft on New York for $3,295, and also an agreement signed by Mr. Woods, at Marlinton. Kindly place the same to Mr. Woods' credit on his delivering to you the proper receipt for same, and much oblige." The draft inclosed was payable, not to Woods, but to the Charlottesville bank. The agreement was not inclosed. This letter did not reach Charlottesville until August 24th. There is some confusion in the record as to whether Woods refused to accept the tender thus made, or whether the Charlottesville bank refused to put the draft to his credit. A careful consideration of the testimony has convinced us that the latter is the truth. In a letter written by Mr. Robertson, of the Charlottesville bank, on August 26th, he says that Woods refused the draft. In both his and Woods' deposition the other version is given. This letter was written on August 26th, after Woods had unequivocally declared the option ended, and had so informed Mr. Robertson, and had refused to accept the draft. And on the 24th the Charlottesville bank telegraphed the Grafton bank, "Yours of yesterday, containing draft, but no agreement, as stated." No point is made that the tender was made by draft, and not in legal-tender currency. But we find no sufficient excuse for the fact that a draft was not forwarded in time to reach Charlottesville on the 23d. There is no pretense that a draft deposited in the mail at Grafton on the 23d, after sending the first telegram of that date, could have reached Charlottesville that day. But, even if it had reached Charlottesville in time, the Charlottesville bank was forbidden to put it to the credit of Woods until "the proper receipt" was given. And the nature of this receipt was made to depend on an agreement that was not inclosed. Whether Mr. Woods was in Charlottesville on the 23d or 24th, we do not know. But we are satisfied from the evidence that on the 25th the Charlottesville bank—McGraw's agent—refused to put the draft to his credit, because the bank did not know the nature of the receipt required. Later on in the day of the 25th, Woods, by a letter written to McGraw, distinctly announced that the Yeager agreement was at an end, and so informed the Charlottesville bank. At no time on the 23d, 24th, 25th, or 26th of August could Woods have obtained the draft, or had it put to his credit. And we think he acted clearly within his rights when he, on the 25th, took the position—from which he never afterwards varied—that the option had expired. We do not find it necessary to discuss the contention that McGraw's agents were acting under instructions to try to keep the option open by a merely seem-

ing effort to make the payment. Assuming that McGraw intended to make payment in due time, he was most unfortunate in the selection of his agent at Grafton. If the Charlottesville bank had put the draft to Woods' credit, even as late as August 26th, it would have violated its instructions from the Grafton bank, and would have made itself liable for such violation. There was a telegram sent on August 27th by the Grafton bank to the Charlottesville bank, after the receipt of Woods' letter of August 25th, and intended by the Grafton bank as an acceptance of the new offer of sale made in that letter. This telegram directed that the $3,295 be paid to Woods, and promised payment of the additional sum demanded by Woods. But this act of the Grafton bank was repudiated by McGraw, the additional sum was not sent, and Woods never accepted the draft for $3,295, which had been, on August 26th, sent back to Grafton by the Charlottesville bank.

The Yeager agreement was an "option." Payment on or before August 23d was of its essence. McGraw forfeited his rights under it without valid excuse for his delay, and we are constrained to hold that the trial court erred in directing a performance of that agreement. It is unnecessary to say that the hardship on the appellee involved in this conclusion cannot excuse us from doing justice to the appellant.

The decree of the Circuit Court will be reversed, with costs, and the cause remanded, with directions that the bill be dismissed, at the cost of the complainant below. Reversed.