## GAINES v. CHEW et al.

(Circuit Court, E. D. Missouri, E. D. February 13, 1909.)

### No. 5,361.

1. MINES AND MINERALS (§ 53*)—OPTION TO PURCHASE MINE—CONSTRUCTION OF CONTRACT.

Time is of the essence of any option to purchase property, and more especially does the rule apply where the property is of a speculative value, such as an undeveloped mine.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 148; Dec. Dig. § 53.*]

2. MINES AND MINERALS (§ 23*)—RIGHTS OF PARTIES JOINTLY INTERESTED IN PROPERTY—STATUTE.

The provisions of Rev. St. § 2324 (U. S. Comp. St. 1901, p. 1426), respecting the rights of co-owners of mining claims where some of such owners have done all the assessment work thereon, have no application to mining property situated in a foreign country.

[Ed. Note.—For other cases, see Mines and Minerals, Dec. Dig. § 23.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. TRUSTS (§ 102*)—RESULTING TRUST—CREATION—FIDUCIARY RELATION BE-
    TWEEN PARTIES.

   Complainant, who with another held an option for the purchase of a
   mining concession in Mexico, entered into a written contract with de-
   fendant by which the latter agreed that if the option could be extended
   to give time for the sinking of a shaft on the property he would furnish
   the necessary money therefor; that if they purchased he should have
   75 per cent. interest, and complainant and his associate 25 per cent., and
   that "the financing of the property will then have to be made jointly by
   all the parties interested." Complainant secured an agreement to extend
   the option, but on condition that an advance payment of $5,000 should
   be made. Complainant did not advise defendant of such condition, and
   the latter sent an agent to exploit the property. On subsequently learn-
   ing of the condition he decided to accept the extension, and called on
   complainant for his share of the advance payment, which complainant
   refused to pay, and thereupon defendant notified him that he should
   allow the option to expire, which he did, but obtained a new one to
   himself, under which he purchased the property. Held, that the contract
   created no such fiduciary relation between the parties as prevented de-
   fendant from treating it as at an end as he did, and that his own pur-
   chase raised no resulting trust in favor of complainant.

   [Ed. Note.—For other cases, see Trusts, Dec. Dig. § 102.*]

In Equity.

Kineally & Kineally, for complainant.

Holmes, Blair & Koerner, for defendants.

TRIEBER, District Judge. The amended bill charges that cer-
tain parties being the owners of a mining concession granted by the
government of Mexico, known as the Hidalgo Mine, entered, in Mex-
ico, into an agreement with one Clayton, whereby they agreed that
he could buy for himself or sell their concession within three months
from July 20, 1905, for the sum of $60,000, Mexican silver, to be paid
$20,000 upon the execution of the conveyance, and the balance in one
and two years in equal installments; that Clayton was to receive 25
per cent. of the purchase money for his services. It was also provided
that, in case of a failure to make the purchase and the payments at
the time specified, the option and all payments made were to be for-
feited. That thereafter Clayton employed complainant to sell said
concession to some person who could provide the capital necessary to
operate the mines thereon, and for his services, in case of a success-
ful sale, he was to receive one-half of the profits and commissions
which Clayton was to have under the option, which would be a one-
eighth interest in the concession. That on September 6, 1905, com-
plainant and defendant Chew entered into a written agreement, which
is as follows:

"St. Louis, September 6, 1905.

"William P. Gaines, Austin, Texas.

   "Dear Sir: Referring to your mining proposition in old Mexico now under
option for $60,000.00, Mexican, to Mr. Clayton of Minaca, Mexico, will say
if the option is extended for sixty days from October 20, 1905, for the first
payment of $20,000.00, Mexican, and permission is given to sink a shaft and
otherwise exploit the property, I will agree to advance $600.00 to sink the
shaft fifty feet deep as per Mr. Clayton's letter, which work is to be under
my own supervision, or that of my representative. After said work is done,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and before the expiration of the option to purchase, I will, at my option to, surrender the option or proceed if I desire. In the event I wish to go ahead with the deal, then I am to have seventy-five per cent. of the property, and Major Gaines and his associates, including Mr. Clayton, twenty-five per cent. The financing of the property will then have to be made jointly by all the parties interested. The option held by Mr. Clayton must be put in the hands of my representative before the expenditure of any monies. In the event I take over the mines the preliminary expenditures advanced shall be paid out of the first funds in the treasury.                      [Signed]  Phil. Chew.

"Accepted:  William P. Gaines.

"Approved, for myself and associates, September 9, 1905:  E. B. Hancock."

That after the execution and delivery of the above agreement, but on the same day, there was a parol agreement entered into between the same parties, whereby it was agreed that in case the defendant Chew concluded to purchase the mine under the option, a corporation should be organized, and when organized there should be conveyed to it not only the three-fourths interest of defendant Chew, but also the one-fourth interest of Clayton and plaintiff, and one-fourth of the capital stock of the corporation issued to plaintiff, one-half thereof for his own use and the other one-half for Clayton; that these shares should be placed in the hands of Chew as trustee for them, and that Chew should have the power to use said shares for the purpose of borrowing money thereon or to vote bonds to be issued by the corporation and used for the purpose of paying the purchase money and the expenses of developing and working the mine; and, in consideration of complainant agreeing to this, Chew would advance all the funds necessary to carry out the terms of the option, the same to be repaid to Chew out of the profits of the mine, Chew retaining plaintiff's and Clayton's stock as security for the advance. That neither plaintiff nor Clayton were to be required to advance any money, but all of it was to be advanced by Chew as aforesaid. That thereupon Rains and Chew entered into a conspiracy with Clayton to deprive plaintiff of his rights. In pursuance of said conspiracy, said defendants on October 16, 1905, four days before the option expired, entered into a contract with Clayton to obtain a new option from the owners for their benefit solely, and to exclude plaintiff from all rights thereunder; that a new option was obtained whereby the holder, the defendant Chew, was required to pay only $5,000, Mexican, instead of $20,000, Mexican, during the first week in November, 1905, and the other $15,000 was to be paid in January, 1906, and the remainder in two equal annual payments thereafter. It was further agreed by them that Clayton was to receive a one-eighth interest, but plaintiff was to get nothing, the defendants claiming that he had forfeited all his rights by reason of his failure to contribute his share of the $5,000, Mexican, payable in November, 1905, for which they had called on him on October 13, 1905.

The bill further charges that on November 3, 1905, Chew made the $5,000 payment under the last option, and thereupon the owners conveyed the concession to him, although it was not to be delivered to him until the deferred payments had all been made. That immediately thereafter he assigned all his rights to the defendant Rains, and he, in accordance with the plans agreed upon between them and

Clayton, transferred the same to the Virginia C Mine, Milling & Smelting Company of Mexico, a corporation organized by Chew in the republic of Mexico with $10,000 capital, with himself, Rains and Clayton, and two other persons as corporators, Chew owning, in fact, all the stock. That afterwards all the stock of this corporation was transferred to the Virginia C Mine, Milling & Smelting Company of Arizona, the corporators in that company being the same as those of the Mexican corporation, the capital of the Arizona corporation being $1,250,000, all of which stock was owned by Chew, although standing in the name of the other incorporators, the same being held in trust for him. That as soon as plaintiff ascertained these facts he called on Chew for his one-eighth interest in the corporation, which was refused, although, equitably, he was entitled thereto under the agreements aforesaid, Chew denying that he was in any manner bound by his agreements as set forth in the bill. That Rains was at all times cognizant of all the facts, including the agreements, written and verbal, between plaintiff and Chew, and that Rains holds the corporate shares in his name, but only in trust for Chew, who is the real owner of all except the one-eighth interest held in trust for Clayton. Clayton, it is charged, is a resident of Mexico, and for that reason cannot be made a party to the bill.

It is further charged that the stock of the corporation is not on the market, and cannot be purchased at any fixed value; that the mine is capable of yielding over $10,000,000 worth of gold and copper under proper management, but there is no fixed value for it; and that Clayton and Rains are both insolvent.

The prayer of the bill is that plaintiff be decreed to be the owner of one-eighth of the stock of the Arizona Company; that Chew be adjudged a trustee of plaintiff therefor, and of one-eighth of all net profits realized out of the mine; that an accounting be had, and if it is found that there is anything due to defendants by reason of advances and expenditures he is ready to pay, and to that end deposited in court $387.50, being the one-eighth part of the money advanced by Chew before the concession was conveyed to him.

The answer to this amended bill admits some of the allegations, and denies others. It denies specifically that Clayton employed plaintiff as charged, or that there was such an agreement between them as charged in the amended bill. It denies that there was any oral contract as alleged between plaintiff and Chew, or any other agreement than that set out in the written offer of Chew and accepted by Gaines, or that the same was ever modified or even proposed by Chew, but, on the contrary, alleges that the written proposition was the only agreement ever entered into between them. It admits that Chew employed Rains to examine the property, expending $600 in its exploitation, but denies that he reported the mine to be very rich, although he recommended it as a good investment. That thereupon Chew decided to avail himself of the option, and on October 13, 1905, notified plaintiff thereof, and asked for $625, American money, the equivalent of $1,250, Mexican silver, being one-fourth of the cash payment to be made on or before October 20, 1905, to prevent a forfeiture, but

plaintiff refused to pay the same or any part thereof. That Chew, when advised of plaintiff's refusal to furnish his share of the money, advised him that he would drop the deal and not buy under the existing option, but they deny that Rains ever advised Chew to get rid of complainant and get the assistance of Clayton to secure complainant's interest, and deny all charges of conspiracy with Clayton; but they admit that after Chew had advised complainant of the repudiation of the contract owing to plaintiff's refusal to pay his part of the purchase money due on October 20, 1905, they negotiated with the owners of the concession for a new option if the other was permitted to become forfeited. They deny that they ever claimed that plaintiff's failure to pay his share caused a forfeiture of his interest in the option, but claim that his refusal to pay said share in conformity with the terms of the contract between Chew and plaintiff released Chew from it, and he so advised plaintiff. They admit that after such notice to plaintiff they secured a new option to themselves subject to plaintiff's rights as long as the first option existed, and in November, 1905 paid $5,000, Mexican, thereon. That this purchase was not made under the option in which plaintiff had an interest, but on a second option negotiated by Clayton for Chew, and in which latter option Gaines had no interest whatever. That in January, 1906, Chew paid the owners of the concession $15,000, Mexican money, and agreed to pay them $20,000 in Mexican money in January, 1907, and a like amount in January, 1908, in conformity with the terms of the option held by Chew, but not under that in which plaintiff was interested. That thereupon the owners, at Chew's request, and in conformity with the terms of the second option, conveyed the mining property to the Virginia C Mine, Milling & Smelting Company of Mexico, to which corporation Chew also caused to be conveyed other mining properties and water rights owned by him, but acquired from other persons and not covered by either option, but which were of greater value than the concession covered by the options. They admit the organization of the Arizona corporation as charged, and the transfer of all the shares of the Mexican corporation to it; but they deny that the moneys advanced by Chew have ever been repaid to him by either corporation, and that there are now large sums of money due him for moneys advanced. They admit that 60,000 shares of the Arizona corporation have been sold, but charge that all the money realized therefrom, and other large sums of money advanced by Chew in addition thereto, have been used partly in paying the purchase money for the concession, and partly in examining and operating the mines, and, while some valuable ore has been mined, none has been sold. They deny that Rains had any knowledge whatever of plaintiff's dealings with Chew, or that anything was done by either to wrong or defraud plaintiff or any other person. They deny that they were aided in their transactions by Clayton, or that Clayton had any knowledge of the agreement between plaintiff and Chew.

A general replication was filed to this answer, and a great deal of testimony was taken. The testimony is very voluminous, and although counsel have abstracted it in a somewhat condensed form (plaintiff's

abstract covers 164 typewritten pages, and defendant's 58 pages), the court had to refer to the testimony in order to determine the issues of facts.

A most important fact is whether there was an oral agreement between the parties, after the execution of the written agreement, materially modifying it as alleged in the bill. Whether oral testimony is admissible to establish this modification and new agreement, and, if so, whether the evidence necessary to establish it must be clear, unequivocal, and convincing, or whether a mere preponderance is sufficient, are questions which the court deems it unnecessary to determine in this case. But the following authorities may be consulted on those questions: Section 2496, Wigmore on Evidence; Sherman v. Sandell, 106 Cal. 373, 39 Pac. 797; Bohm v. Bohm, 9 Colo. 111, 10 Pac. 790, as to what evidence is necessary to establish it; and Whitney v. Hay, 181 U. S. 77, 89, 21 Sup. Ct. 537, 45 L. Ed. 758, and the leading English case, Reach v. Kennegate, 1 Ves. 125, decided by Lord Hardwick—as to whether oral evidence is admissible for the purpose of establishing a constructive trust.

A careful examination of the evidence fails to satisfy me that there is a preponderance of the evidence in favor of the plaintiff. The evidence clearly shows that Chew is a practical business man of large experience, and very careful in all his business transactions. The agreement prepared by him and accepted by the plaintiff shows that he did not intend to go into this transaction blindly, but that he wished to make a careful examination of the property before investing any money. In order to enable him to do so, the time of the life of the option being short, he made it a condition precedent, before he was to make any examination and expend any money for that purpose, that the option should be extended for 60 days from October 20, 1905, for the first payment. The most favorable view that can be taken is that the evidence is so evenly balanced that it is impossible to say that there is a preponderance in favor of either party.

In determining the other questions at issue in this cause, it is important to note that the mining concession, the subject of the negotiations between the parties, was not a contract of purchase and sale, but merely an option by which the owners of the concession obligated themselves to sell it to Clayton or his assigns upon certain terms, without any corresponding assumption on the part of Clayton to make the purchase. Besides, the option specifically provides that:

"If the buyer omits to make any one of the payments which are referred to at the end of the second clause of the contract, at the expiration of each time of payment, this contract will become nullified and without any value, the grantee losing the payments already made."

It is well settled that time is the essence of any option, and more especially does it apply where the property is of a speculative value, such as an undeveloped mine. Taylor v. Longworth, 14 Pet. 172, 10 L. Ed. 405; Richardson v. Hardwick, 106 U. S. 252, 1 Sup. Ct. 213, 27 L. Ed. 145; Waterman v. Banks, 144 U. S. 394, 12 Sup. Ct. 646, 36 L. Ed. 479; Kelsey v. Crowther, 162 U. S. 404, 16 Sup. Ct. 808, 40 L. Ed. 1017; Woods v. McGraw, 127 Fed. 914, 63 C. C. A.

556; Kentucky Distilleries & Warehouse Co. v. Warwick Co., 109 Fed. 280, 48 C. C. A. 363; Mason v. Payne, 47 Mo. 517.

Counsel for plaintiff cite a number of decisions arising under section 2324, Rev. St. (U. S. Comp. St. 1901, p. 1426), and also cases in which the parties were partners engaged in the development of mines, but they clearly do not apply to this case, as the parties never were co-owners of any mine or mining property, nor was this a mineral entry under the laws of the United States. It was simply an option to purchase something in a foreign country which happened to be a mine. Nor do the cases cited by learned counsel for plaintiff to sustain the contention that forfeitures are not favored and will not be enforced in equity apply, for this was not, strictly speaking, a contract, but a naked option which contained a stipulation of forfeiture as hereinbefore set out.

Was Chew, by reason of the written agreement existing between him and plaintiff, occupying such a fiduciary relation towards plaintiff, that the purchase by him, after the refusal of plaintiff to furnish his proportionate share of the purchase money when due, would make the later purchase a fraud upon plaintiff's rights, and for this reason he should be charged as a trustee of a constructive trust for plaintiff's benefit? Unless plaintiff complied with the terms of that written agreement and furnished his proportionate share of the money for the first payment under the option, there could be no express trust. If any trust can be established, it must be a constructive trust, but such a trust can arise only when a person clothed in some fiduciary character, by fraud or otherwise, gains some advantage to himself. As stated by Judge Sanborn in Trice v. Comstock, 121 Fed. 620, 57 C. C. A. 646, 61 L. R. A. 176:

"The only indispensable elements of a good cause of action to enforce such a trust are the fiduciary relation and use by one of the parties to it of the knowledge or the interest he acquires through it (the fiduciary relation) to prevent the other from accomplishing the purpose of the relation."

Constructive trusts differ from other trusts in that they are not within the intention and contemplation of the parties at the time the contract is made from which they are construed by the court, but they are thrust upon the party contrary to his intention and against his consent. Perry on Trusts, § 166.

As the court finds that the verbal agreement charged in the bill has not been proved, was there anything in the written agreement to establish such a fiduciary relationship as prohibited the defendant from making the purchase after the forfeiture of the option caused by the refusal of plaintiff to contribute his share of the purchase money as required by the agreement? In connection with this matter, it is important to call attention to some of the testimony.

When the contract between plaintiff and defendant, Chew, was entered into, Chew insisted, as a condition precedent, upon an extension of the option in order to give him an opportunity to have an investigation made of the property. The plaintiff wired to Clayton asking for such an extension, and received in reply a telegram from Clayton, "Extension granted upon conditions," referring to a letter he had writ-

ten explaining the conditions. This letter, it seems, had been sent to Austin, Tex., the home of the plaintiff, who was then in St. Louis negotiating with Chew. He thereupon telegraphed to Hancock, who also had an interest in this option, to open that letter and wire him at St. Louis what it contained. Hancock wired back that the conditions referred to were that an extension for the first payment would be granted, provided work was commenced at once, but, in truth and in fact, one of the conditions stated in the letter was that a payment of $5,000 was to be made at once, and the other $15,000 in January.

It is but proper to say that while in St. Louis plaintiff apparently acted in good faith, and showed all telegrams which he sent to and received from his associates to the defendant Chew, but after his return to Austin, when he saw the letter of Clayton, which stated the conditions upon which the extension was granted, namely, "upon the payment of $5,000.00, Mexican, on October 20, 1905, an extension of ninety days will be granted, and said $5,000.00 to be deducted from first payment of twenty thousand dollars to be paid January 20, 1906," he concealed that fact from the defendant. On September 9th, after his return to Austin, and after seeing the letter and having Hancock approve the agreement, he wired and wrote to Chew in relation to the agreement, but failed to mention the conditions of the extension. On September 12th he wrote again to Mr. Chew, saying:

"Mr. Hancock says that Mr. Clayton thinks the owners of the mine might want you to put up a small amount of money after examination of the mine if it should prove satisfactory; but he also says he is satisfied Mr. Rains could avoid this if he goes down prepared to begin development work in the event the mine is satisfactory on inspection,"

—never mentioning the conditions contained in Clayton's letter. It is thus shown that after he returned to Austin, and before he was called upon to pay his proportion of the $5,000 due October 20th, he had seen the letter from Clayton and knew that one of the conditions mentioned in Clayton's telegram to him while in St. Louis was that payment of $5,000 was to be made on the day the first installment was due, and that the option was only extended as to the payment of the other $15,000 under the agreement. On September 23d Chew wrote to Gaines complaining of these facts, and saying:

"I am free to say, and so stated to you repeatedly, that if it was necessary to pay money on this mine before I could exploit it, I would not touch it, and would, therefore, not have been out the money expended by Mr. Rains so far."

Not only was there no obligation on the part of Chew to advance the money for him, but the contract specifically provided that the financing of the property would have to be made jointly by all the parties interested. There was no obligation on the part of Chew to advance the money for him, and plaintiff knew that the failure to pay the money according to the terms of the option as modified would forfeit it. After having been called on by Chew on October 13th, his refusal to pay, he having at that time full knowledge of the terms, as shown by the letter of Mr. Clayton to him, worked a forfeiture of the option.

The vendors thereupon had a right to sell to any other persons, and there is no principle of equity jurisprudence which would prevent Chew, after that forfeiture, from entering into a new agreement with the vendors. This last agreement was, in fact, outside of the terms of the agreement between plaintiff and Chew, and comes within the rule laid down in Latta v. Kilbourn, 150 U. S. 524, 14 Sup. Ct. 201, 37 L. Ed. 1169. The result might have been different if Chew had failed to call upon plaintiff for his proportion of the money, or in any way misled him to his detriment, or prevented him from carrying out his part of the agreement. But there is no such proof in this case. Chew called on plaintiff for his share of the money in ample time to enable him to furnish it. He refused to do so with full knowledge of the fact that unless the $5,000 was paid on October 20th all rights under the option would be forfeited. He permitted the forfeiture to take place, and thereafter had no further interest in the purchase of the mine, nor was there anything which made Chew occupy a fiduciary relation towards him. Had the purchase been made by a stranger, although he had knowledge of all the agreements between Gaines and Chew, he could have made no claim for an interest. He had been advised that Chew would not advance his share of the money, and upon his failure to furnish it the agreement was treated as at an end. Nothing was done by Chew to prevent him from carrying out the agreement, and, when he refused to do so, Chew had the same rights as a stranger would have had.

From a careful consideration of all the testimony in this case, it is impossible to escape the conclusion that plaintiff had no intention of ever paying his share of the money necessary to purchase the mine and to exploit it; that he intended to make Chew advance all the money, and, if the mine should prove successful, claim his share in it, and, should it prove unsuccessful, let Chew bear the entire loss. Mr. Von Phul, his partner in the transaction, in a letter to him dated October 13, 1905, after Chew had called on them for their proportion of the $5,000, said:

"I had worked myself up to believing, thinking, that I had a big fortune to fall back on in my old age. All gone up in smoke."

Mining claims are not only subject to great and sudden fluctuations in value, but it is impossible to tell, even after careful examination by experts, whether they will prove valuable or not. What may appear to be a vein of great value may turn out to be a pocket, and it is for this reason that courts of equity will refuse to grant relief in such cases, if the suit is not brought within a comparatively short period after the deprival of his rights became known to him. In view of the concealment of the terms upon which the option was to be extended, Chew was justified in losing confidence in the integrity of the plaintiff, and he had a right to stand upon the strict letter of his agreement with plaintiff.

In the opinion of the court, there is no equity in plaintiff's claim, and the bill will be dismissed accordingly.