## WATERMAN *v.* BANKS.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF CALIFORNIA.

No. 190. Argued March 7, 8, 1892. — Decided March 28, 1892.

J. S. W. having advanced to his brother R. W. W. moneys to aid him in developing mines, the title to which was in dispute, and being about to

advance further sums for the same purpose, the latter executed and delivered to him an agreement as follows : " San Bernardino, Cal., May 14th, 1881. — For and in consideration of one dollar to me in hand paid, the receipt whereof is hereby acknowledged, I hereby agree that at any time within twelve months from this date, upon demand of J. S. Waterman or his heirs, administrators or assigns, I will execute to him a good and sufficient deed of conveyance to an undivided twenty-four one-hundredths ($\frac{24}{100}$) of the following mines, known as the Alpha, Omega, Silver Glance and Front, each being 600 feet wide by 1500 ft. long, and the same interest in all lands that may be located or *has* been located for the development of the above mines, with such machinery and improvements as *is* to be placed upon same, all subject to the same proportion of expenses, which is to be paid out of the development of the above property, all situated near the Grape Vine, in the county of San Bernardino, State of California." *Held,*

(1) That, taken in connection with the evidence, this conveyed to J. S. W. no present interest in the property, but only the right to acquire such an interest within a period of " twelve months from this date."

(2) That time was of the essence in such a contract for acquisition.

The principle that time may become of the essence of a contract for the sale of property from the very nature of the property itself is peculiarly applicable to mineral properties which undergo sudden, frequent and great fluctuations in value, and require the parties interested in them to be vigilant and active in asserting their rights.

THE court stated the case as follows :

This appeal brings up for review a decree requiring R. W. Waterman, the original defendant, to convey, free from incumbrance, to Abbie L. Waterman, the original plaintiff, and the widow and assignee of J. S. Waterman, an undivided twenty-four one-hundredths of certain mining property in San Bernardino County, California, and, also, to pay to her the sum of $42,987.22, which was adjudged to be the amount of profits derived from that property, with the interest that accrued thereon prior to January 10, 1888. 27 Fed. Rep. 827.

J. S. Waterman and R. W. Waterman were brothers; the former, of large wealth, and a citizen of Illinois, and the latter, of limited means and a citizen of California, engaged with one Porter in "prospecting" and developing mining property. R. W. Waterman and Porter having acquired certain mining claims or interests in San Bernardino County, California, the

former wrote a letter to his brother, under date of April 5, 1881, which seems to be the beginning of the transactions out of which the present litigation arose. The writer said: "Porter finished assay yesterday, and will start in tomorrow. The mine improves all the time. It goes beyond our most sanguine expectations. The chimney will extend somewhere about 800 or 1000 feet, and is worth itself millions. The assay for the dump, after picking out the best ore and assay, the average of the poorest is over $50 and, so far as we can see, the entire mass is very rich. . . . Now, we can fight all of them, pay all expenses and make a million a year, but I don't anticipate much, if any trouble. . . . You let Mr. Porter have some money to pay his expenses without his asking for it. He is one of the most modest men I ever saw. I want you to have a talk with Jane about your joining me and having an interest in the mine. It will include the four claims, the Alpha, Omega, Front and Silver Glance. They are — what there is of it, and either one is enough to form a company. I propose to let you have $\frac{24}{100}$ of my interest of $\frac{75}{100}$ — you give up my indebtedness and give me to pay off any debts that I have incurred in mining, say $2000. That $\frac{24}{100}$ is worth $250,000, and may be $\frac{1}{2}$ a million to sell outside of this. All the money you get to buy machinery or advance in any way shall be paid from the first earnings of the mill. You might be at the head of the affair financially, and otherwise; each one of us to have his part, but you be at the head. . . . You speak to Porter about our partnership. I know he is all O. K. and will not pretend to own but $\frac{1}{4}$; yet try him. I presume he would give you a share of his if you raise the money for us."

It does not appear that any formal reply was made to this letter. But it does appear that J. S. Waterman was in California the succeeding month, and took from his brother an obligation of which the following is a copy:

"SAN BERNARDINO, CAL., *May* 14, 1881.

"For and in consideration of one dollar to me in hand paid, the receipt whereof is hereby acknowledged, I hereby agree that at any time within twelve months from this date, upon de-

mand of J. S. Waterman or his heirs, administrators or assigns, I will execute to him a good and sufficient deed of conveyance to an undivided twenty-four one-hundredths ($\frac{24}{100}$) of the following mines, known as the Alpha, Omega, Silver Glance and Front, each being 600 feet wide by 1500 ft. long, and the same interest in all lands that may be located or *has* been located for the development of the above mines, with such machinery and improvements as *is* to be placed upon same, all subject to the same proportion of expenses, which is to be paid out of the development of the above property, all situated near the Grape Vine, in the county of San Bernardino, State of California.

" R. W. WATERMAN."

This was the obligation, the specific performance of which was required by the decree below.

An obligation of like character as to date and terms was taken by J. S. Waterman from Porter with respect to an undivided three one-hundredths of the same property.

Prior to, but, perhaps, in expectation of, the execution of these writings, J. S. Waterman advanced to his brother and Porter the sum of $1817, and, subsequently, other sums, the aggregate amount of advancements, on the 22d day of November, 1881, being $26,317, exclusive of interest. For each sum so advanced, J. S. Waterman took the notes of R. W. Waterman and Porter. It also appeared that when the writings of May 14, 1881, were given, R. W. Waterman was indebted to J. S. Waterman in the sum of $11,750.53 for moneys loaned. But R. W. Waterman contended that if all matters of business between them had been settled, he would not have been then indebted to his brother in any sum whatever.

J. S. Waterman died July 19, 1883, having made a will, which was dated November 28, 1870. That will provided, among other things, that any and all notes, bills, accounts, agreements or other evidence of indebtedness against any of his brothers, held by the testator at his decease, be cancelled by his executors and delivered up to the maker or makers without payment of the same or any part thereof, except two

notes against John C. Waterman, secured by a deed of trust on lands, which were to be collected and equally divided between his brothers and sisters, and the children of such as had died. By a codicil to the will, of date December 7, 1872, his brother R. W. Waterman was substituted as executor in place of George S. Robinson.

Upon the paper of May 14, 1881, given by R. W. Waterman, appears the following endorsement: "I hereby assign the within to Mrs. Abbie L. Waterman. J. S. Waterman. - M'ch, 1883. I hereby agree to execute the within agreement on demand." In March, 1883, the paper with this endorsement upon it was presented to R. W. Waterman, and he refused to sign it. At that time there was a balance of about $11,000 due J. S. Waterman on the notes given by R. W. Waterman and Porter. Porter signed a similar endorsement on the writing of May 14, 1881, executed by him. But the evidence satisfactorily shows that he did this only to indicate his willingness that that paper should stand as security simply for the moneys advanced by J. S. Waterman.

All the moneys advanced to R. W. Waterman and Porter were repaid out of the proceeds of the mining property before the institution of this suit, the principal part before and the balance after the death of J. S. Waterman.

No demand was made upon R. W. Waterman or Porter at any time within twelve months after May 14, 1881, for a conveyance, nor until after the death of J. S. Waterman.

This suit and the decree below proceeded upon the general ground that the writing of May 14, 1881, was intended to pass, and was accepted as passing, a present interest of twenty-four one-hundredths in the property covered by its provisions, and required R. W. Waterman to convey such interest at any time, before or after the expiration of twelve months from that date, on the demand by J. S. Waterman, his heirs, administrators or assigns of a conveyance. The defendant disputed this interpretation of that instrument and insisted that it was given and accepted only as security for such moneys as J. S. Waterman might advance for the development or management of this property.

*Mr. George F. Edmunds* for appellant. *Mr. H. M. Willis* was on the brief for same.

*Mr. Charles C. Bonney,* (with whom was *Mr. E. W. Mc-Graw* on the brief,) for appellee.

The court will not hold itself too strictly bound by technicalities or literal expressions, but will construe, interpret and apply the contract, as far as the circumstances will permit, according to the justice of the case. *Bank of Alexandria* v. *Linn,* 1 Pet. 376.

The fact that the complainant's assignor had fully performed the contract on his part will be deemed a powerful aid to the granting of the relief sought. *Brashier* v. *Grantz,* 6 Wheat. 528, 534. The consideration having been fully paid and performed, the delay of the purchaser in calling for the deeds was wholly immaterial. *Walton* v. *Coulson,* 1 McLean, 120; *Hearst* v. *Pujol,* 44 California, 230.

The right to an account for a proper share of the profits of the mines, is in equity beyond controversy; otherwise the delinquent party would be protected in taking advantage of his own wrong. *Warrell* v. *Munn,* 38 N. Y. 137; *Nelson* v. *Bridges,* 2 Beavan, 239; *Barnum* v. *Landom,* 25 Connecticut, 137.

From the making of the contracts to the completion of the payment of the consideration, the vendors held the interest covered by the contracts, as security for performance by the vendee. From the date of that completion the vendors have held the legal title to that interest as trustees of the purchaser, and subject to an account for the rents and profits derived from it. *Willis* v. *Wozencraft,* 22 California, 607; *Love* v. *Watkins,* 40 California, 547.

*The supposed " option " in the contract is not a fact but a fiction.* The true meaning of the agreement is that within twelve months from the date of the contract, or at any time upon demand, the deed shall be made. The transposition of the words " at any time " was doubtless a merely clerical error, and is easily corrected by a proper construction. But

if the contract had in fact given an option, as appellants contend, *the payment of the consideration* by James S. Waterman would have matured that option and made the contract absolute. *Bell* v. *Quarles*, 5 Yerger, 463; *Tinney* v. *Ashley*, 15 Pick. 546; *S. C.* 26 Am. Dec. 620; *Fleming* v. *Harrison*, 2 Bibb, 171; *S. C.* 4 Am. Dec. 691.

Mr. Justice Harlan, after stating the case, delivered the opinion of the court.

We cannot assent to the view taken by the court below. The bill alleges — and the evidence fully sustains the allegation — that when the writing in question was given, the title to this property was in dispute, and that its development and improvement involved the expenditure of large sums, great risk of the total loss of everything invested in it and uncertainty of profit. Under these circumstances, J. S. Waterman, according to the decided preponderance of the evidence, did not wish to become a part owner of the property or to incur the responsibility of developing and managing it in conjunction with his brother and Porter. He was entirely willing, indeed, anxious, to assist his brother, but was not willing, at the outset, to take an interest in the property, or to become connected with them in business. His chief concern then was to secure the repayment of sums advanced and to be advanced by him to his brother and Porter for the development of the property, postponing to a future time the decision of the question as to whether he would take an interest in the property as suggested in the letter of April 5, 1881. If it proved to be valuable, he would incur no responsibility by becoming a part owner and uniting with his brother and Porter in its development and management. If it proved to be worthless, and if his brother and Porter were unable to meet their notes, he would only lose, and, as he possessed large wealth, could afford to lose, the sums advanced by him. These were the objects he had in view when he prepared and obtained from his brother the writing of May 14, 1881. That writing evidently contemplated that "out of the development of the above property," that is, out of its earnings, were to be paid

the expenses incurred in providing machinery, in making improvements, etc. These expenses were to be met, in the first instance, by the moneys advanced by J. S. Waterman to his brother and Porter. They could not have been otherwise paid; for the resources of R. W. Waterman and Porter were very limited, and the property had not then been sufficiently developed to become itself the basis of borrowing large sums from banks or from individual lenders of money. All this is manifest from the facts in the case.

But it is clear from the face of the writing, without calling to our aid the circumstances under which it was executed, that J. S. Waterman did not stipulate for a present interest in the property. It was drawn so as not to give him an interest, as owner, during the period supposed to be required for its development. While intended by the parties as security for moneys advanced and to be advanced by J. S. Waterman, it contains no word or clause indicating a purpose to create, as of its date, the relation of purchaser and vendor between him and R. W. Waterman. It gave the former, his heirs, administrators and assigns, an option to demand a conveyance within a prescribed period, thus making time of the essence of the agreement. If a conveyance was not demanded within that period, the obligation of R. W. Waterman to make one ceased altogether. Such was the contract; and the suggestion that the transposition of the words, " at any time," was a mere clerical error, to be corrected by construction, is simply an appeal to the court to make for the parties an agreement they did not choose to make for themselves and then decree its specific performance. No principle of equity would support such a decree. *Hepburn* v. *Dunlop*, 1 Wheat. 179. The demand for a conveyance within a given time — looking alone at the writing — was made by the parties a condition precedent to the acquisition by J. S. Waterman of an interest in the property. R. W. Waterman did not agree to convey except upon the performance of that condition precedent. The condition being lawful, it is not competent for the court to dispense with its performance.

The principles by which a court of equity is governed in cases of this character are well settled. Mr. Justice Story says

that " notwithstanding the rule is well established in courts of equity, that time will not be regarded as indispensable, in regard to decreeing specific performance of contracts for the actual sale of lands on one side and the actual purchase on the other, it is different where the contract gives a mere election to purchase upon certain conditions. Accordingly, where upon a lease, with the right of purchase within seven years, upon giving three months' notice, and paying a fixed sum at the expiration of such notice, and the lessee gave the requisite notice, but did not pay the money in time, a bill for specific performance was dismissed. And a similar decision was made by the Lord Chancellor, where his lordship said : ' The things required must be done in the order of sequence stipulated. These were notice and the payment of the money, on a day certain.' " Story, Eq. Jur. § 777 a. In *Potts* v. *Whitehead*, 20 N. J. Eq. (5 C. E. Green), 55, 57, 59, which was a suit for the specific performance of a contract to convey land — the owner stipulating, for the consideration of one dollar, that the complainant should have, for thirty days, the refusal of the lands — the court said: "The paper signed by the defendant is not a contract, but on its face, and by its very terms, only a refusal or offer of the lands to the complainant at a certain price ; this is not disputed by the counsel of the complainant. · This, like all such offers, was not binding, and could not be converted into a contract, unless accepted within the thirty days. Whether, when such an offer is made for a mere nominal consideration, the person offering can withdraw it within the time specified, it is not necessary to consider, as it was not withdrawn, and, like all such offers, it would be binding if accepted within the time, and before it was withdrawn." Again: "There can be no question but that when an offer is made for a time limited in the offer itself, no acceptance afterwards will make it. binding. Any offer without consideration may be withdrawn at any time before acceptance ; and an offer which in its terms limits the time of acceptance is withdrawn by the expiration of the time."

The rule is well expressed in *Lord Ranelagh* v. *Melton*, 2 Drewry & Smale, 278, 281, where it was said : "No doubt if

an owner of land and an intending purchaser enter into a con-
tract constituting between them the relation of vendor and
purchaser, and there is a stipulation in the contract that the
purchase money shall be paid and the contract completed on a
certain day, this court in ordinary cases has established the
principle that time is not of the essence of the contract and
that the circumstances of the day fixed for the payment of the
money and the completion of the purchase being past does not
entitle either party to refuse to complete. On the other hand,
it is well settled that when there is a contract between the
owner of land and another person, that if such person shall do
a specified act, then he (the owner) will convey the land to
him in fee, the relation of vendor and purchaser does not exist
between the parties unless and until the act has been done as
specified. The court regards it as the case of a condition on
the performance of which the party performing it is entitled
to a certain benefit; but in order to obtain such benefit he
must perform the condition strictly. Therefore if there be a
day fixed for its performance, the lapse of that day without
its being performed prevents him from claiming the benefit."

In *Taylor* v. *Longworth*, 14 Pet. 172, 174, the principle was
recognized that time may become of the essence of a contract
for the sale of property not only by the express stipulation
of the parties, but from the very nature of the property itself.
This principle is peculiarly applicable where the property is
of such character that it will likely undergo sudden, frequent
or great fluctuations in value. In respect to mineral property
it has been said, that it requires, and of all properties, per-
.haps, the most requires, the parties interested in it to be vigi-
lant and active in asserting their rights. *Prendergast* ·v. *Lis-
ton*, 1 Yo. & Coll. Ch. 110; *Doloret* v. *Rothschild*, 1 Sim. &
St. 590, 598; Fry on Specific Performance, §§ 714, 715;
Pomeroy on Contracts, §§ 384, 385; *Brown* v. *Covillaud*, 6
California, 566, 572; *Green* v. *Covillaud*, 10 California, 317,
324; *Magoffin* v. *Holt*, 1 Duvall, 95.

That J. S. Waterman did not, in fact, accept the writings
of May 14, 1881, as passing to him a present interest in the
property, but at the utmost, as security for the moneys

advanced and to be advanced by him, with a right reserved, or the option given, to demand a conveyance within a certain time, is established by many facts and circumstances disclosed by the evidence.

When those writings were given, the title of R. W. Waterman and Porter to this mining property was disputed by one Miller. This fact was well known to J. S. Waterman. In a suit brought by Miller he was examined as a witness for R. W. Waterman for the purpose of contradicting the evidence of Miller. His cross-examination as taken down, at the time, by the official reporter of the court, was as follows: "Q. Have you any pecuniary interest in this litigation? A. No, sir. Q. Have you any interest in any of these mines out there? A. No, sir. Q. Or in the mill? A. No, sir. Q. Haven't you made advances of money the repayment of which is dependent principally upon your brother and Porter retaining these mines and working them? A. Yes, sir; I loaned them money. Q. And you understand that their ability to pay depends in a great measure, if not entirely, upon their retaining these mines and working them successfully? A. That hasn't been talked over. Q. Isn't that your understanding of it? A. That is the understanding; they would have to pay out of the mines. Q. They would have no other mines to pay you from? A. They have other mines. Q. Do you think they have other mines that would respond? A. I think Mr. Porter has, or either one of them. I merely have their promise to pay, no security. Q. Haven't you been up the country examining mills and machinery for their use? A. Yes, sir. Q. Haven't you taken an active interest in their mining operations? A. I purchased the mill; yes, sir. I became security for them."

The learned counsel for the plaintiff, referring to this evidence, observes: "But it is said, that subsequently to the date of the contracts, James S. Waterman admitted that he had no interest in the mines, but it does not appear that he was then the owner of the contracts. It may be presumed from the evidence that he had previously assigned them to complainant." But it does appear, conclusively, that the above

statement by James S. Waterman, under oath, that he had no interest in the mines, was made subsequent to the execution of the writings of May 14, 1881, after he had advanced to R. W. Waterman and Porter nearly twenty-four thousand dollars, but long before the assignment of the writing of May 14, 1881, to his wife. The assignment to Mrs. Waterman was in March, 1883 — it is so alleged in the bill — while the cross-examination of J. S. Waterman in Miller's suit took place in August or September, 1881. This latter fact is proved by several witnesses, some of whom participated in the trial as attorneys, and from numerous letters which passed between R. W. Waterman and J. S. Waterman shortly after the writings of May 14, 1881, were executed. R. W. Waterman wrote to his brother, under date of July 16, 1881, "I expect you will have to come out next mo., that suit must come off, I am tired of holding witnesses;" under date of July 22, 1881, "Things are transpiring which I fear will make us work to beat Miller. . . . If the suit comes off you must be here;" under date of July 30, 1881, "I shall do all I can to get this trial on right away, and you must hold yourself in readiness to come out at a moment's warning. . . . I will telegraph you when wanted;" under date of August 2, 1881, "It [the suit] is set for the first Monday in September, and you must be here. The lawyers say that your evidence is very important, and your presence will help very much;" under date of August 3, 1881, "I wrote you my suit came off in Sept., they changed the time, 'tis the 30th of August, and you must be here, Rowell and Willis say 'tis very necessary;" under date of August 10, 1881, "Hope nothing will prevent your being out at the suit;" under date of August 15, 1881, "I am at Rowell's office; he says you must be here; my case is set for the 30th of August and Porter's for September 3, don't fail us;" under date of August 15, 1881, "The suits are set for the 30th of August and 3d of September; come the northern route;" under date of August 20, 1881, "I really hope you will be able to be here at the suit, 'tis set for Aug. 30, and Porter's for Sept. 3, and can't be put off." To R. W. Waterman's letter of July 30, 1881, J. S. Waterman replied, "I shall

hold myself in readiness, but you see Rowell and Willis before you send;" and in a letter of August 8, 1881, he said, "Try and not send for me till the last of the month or 1st of Sept."

It thus appears that J. S. Waterman, in response to these urgent requests of his brother to attend the trial of the Miller suit, went to California, and stated, under oath, when the execution and object of the writings of May 14, 1881, must have been fresh in his recollection, that he had no interest in the mines in question in that suit, and which are the identical mines referred to in those writings. How can the theory of this suit, namely, that J. S. Waterman acquired a present interest by the writings of May 14, 1881, be sustained consistently with his oath in the Miller suit? He was, as we infer from the record, a gentleman of intelligence, and it must be assumed that he knew what he was saying when he testified in August, 1881, that he had no pecuniary interest in the litigation between Miller and his brother, involving the title to this property, and no interest in the mines themselves.

To all this may be added the fact, established by several witnesses, that J. S. Waterman declared, in their presence, on different occasions, that he did not have an interest in this property, and only desired to secure the repayment of such sums as he advanced to his brother and Porter on account of it.

The only fact that is apparently inconsistent with the view we have taken of the evidence is the offer made by R. W. Waterman in his letter of April 5, 1881, that his brother should take an interest in these mining claims. But it does not appear that this offer, as made, was accepted. On the contrary, the decided preponderance of evidence shows that, upon full consideration, he declined to take a present interest in the property as one of its owners; that, at the outset, he only sought to be secured in respect to the money he might advance to his brother and Porter; and that the writings of May 14, 1881, were intended by the parties simply as security for the moneys so advanced, with an option to J. S. Waterman to demand a conveyance of the respective interests described, within a time limited.

As the moneys advanced by J. S. Waterman to R. W. Waterman and Porter were all repaid before the commencement of this suit, and as no conveyance was demanded from R. W. Waterman within the time limited by his obligation, the plaintiff was not entitled to the relief asked.

One other point requires notice at our hands. An interlocutory decree was rendered declaring the plaintiff to be entitled to the relief asked, and the cause was referred to the master to state the accounts between the parties in respect to the use of the property, and the profits derived from it. The master made his report, and the final decree recites that each party waived the right to except to it. This waiver is relied upon as showing that the final decree was by consent, and, therefore, not to be questioned in this court. This contention is overruled. The waiving of exceptions to the master's report meant nothing more than that the appellant did not dispute its correctness in respect to the amount of the profits realized from the property. This waiver had no reference to the fundamental inquiry as to whether the plaintiff was entitled to a conveyance. But as, for the reasons stated, R. W. Waterman was not bound to convey — the time having elapsed in which a conveyance could be rightfully demanded — the entire decree falls.

*The decree is reversed and the cause remanded with directions to dismiss the bill.*