BEEBE v. WORTH.

(Supreme Court, Equity Term, Monroe County. February, 1914.)

1. PRINCIPAL AND AGENT (§ 146*) — UNDISCLOSED PRINCIPAL — LIABILITY OF AGENT.

Where the principal is not disclosed by the written contract, which was signed by defendant as agent, plaintiff may proceed personally against the agent as the ostensible principal.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 521–527; Dec. Dig. § 146.*]

2. MINES AND MINERALS (§ 53*)—CONTRACTS—TIME.

In an option to purchase mining property, time is always considered to be of the essence of the contract on account of the liability of the property to great fluctuation in value.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 147, 148; Dec. Dig. § 53.*]

3. ACCORD AND SATISFACTION (§ 2*)—WHAT CONSTITUTES.

Plaintiff had an option with the secretary of a mining corporation for the purchase of a large number of shares of stock. Upon the mine proving a success, plaintiff, who had rendered services, requested the directors to issue him a large number of shares at a given price. The directors voted to issue him a number of shares at a given price, with the stipulation that the acceptance of such shares should be a waiver of all claims against the corporation and the secretary. *Held*, that the issuance and acceptance of such shares constituted an accord and satisfaction barring recovery against the secretary.

[Ed. Note.—For other cases, see Accord and Satisfaction, Cent. Dig. §§ 14–21, 33; Dec. Dig. § 2.*]

4. ACCORD AND SATISFACTION (§ 3*)—WHAT CONSTITUTES.

If what is given by a stranger is accepted by the creditor in satisfaction of his claim against the debtor, the creditor cannot proceed against the debtor; and hence, where a corporation made the satisfaction of plaintiff's claim against its secretary on account of an option for the purchase of stock, a condition to the issuance of stock, the issuance and acceptance of the stock barred plaintiff's rights against the secretary, even though the corporation was a stranger to the transaction.

[Ed. Note.—For other cases, see Accord and Satisfaction, Cent. Dig. §§ 22–30; Dec. Dig. § 3.*]

5. ACCORD AND SATISFACTION (§ 5*)—WHAT CONSTITUTES.

The value received in case of an accord and satisfaction does not affect its validity.

[Ed. Note.—For other cases, see Accord and Satisfaction, Cent. Dig. §§ 40–45; Dec. Dig. § 5.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. ACCORD AND SATISFACTION (§ 20*)—EFFECT.

> Where plaintiff, who had a contract with defendant for the purchase of corporate shares, accepted other shares, issued to him by the corporation on condition that he should waive his rights against defendant, and treated them as his own, with knowledge of defendant's power to transfer shares, the fact that at the time the settlement was made defendant misrepresented his power will not avoid the accord and satisfaction.

> [Ed. Note.—For other cases, see Accord and Satisfaction, Cent. Dig. §§ 140–142; Dec. Dig. § 20.*]

Action by George H. Beebe against S. Harry Worth. Judgment for defendant.

Costello, Burden, Cooney & Walters, of Syracuse (Oliver D. Burden, of Syracuse, of counsel), for plaintiff.

Havens & Havens, of Rochester (Samuel M. Havens, of Rochester, of counsel), for defendant.

SUTHERLAND, J. The facts with reference to the controversy involved here have been stated in much detail in the formal decision filed herewith. It is due to the parties, and the learned counsel who have represented them with great ability, that the decision dismissing the complaint should be supplemented with a discussion of the reason why, in my opinion, the judgment should be for the defendant. That reason summarized is that the plaintiff's cause of action was settled in full in December, 1912, by the issue of 10,000 shares of the Seneca-Superior Silver Mines Company, Limited, to the plaintiff, with the knowledge and co-operation of the defendant, and accepted by the plaintiff as a full accord and satisfaction of his claim against the defendant.

About April 4, 1912, defendant gave plaintiff a written option, covering a total of 75,000 shares of stock of the Seneca-Superior Silver Mines Company, Limited. Of this amount 32,499 shares remain undelivered, and are the shares which plaintiff is endeavoring to procure by a decree of specific performance in this action. The option agreement, as I interpret the instrument, gives in reality eight distinct and severable options; the first seven covering seven distinct blocks of stocks of 10,000 shares each, and the eighth covering a block of 5,000 shares. The option agreement was unilateral, the plaintiff not being bound to take any of the stock, and by taking one block he did not obligate himself to take any more. Under its terms payments upon each block, if taken, were to be in four equal monthly installments, the first installment of $437.50 on the first block being payable on the signing of the option; the second installment on the first block was due April 29th, on which day the first installment on the second block was due, if that block were taken. May 29th the third installment on the first block, the second on the second, and the first installment on the third block, were due. June 29th the final installment was due on the first block, the third on the second, the second on the third and the first on the fourth block; and so on thereafter on the 29th of July,

---

August, September, October, November, and December, payments on the respective blocks fell due. October 29th the first payment was due on the last block of 5,000 shares, and January 29, 1913, was the day for final payment on that block. The option concluded with this clause:

"On the failure of said Beebe to make any of the payments herein specified this entire agreement shall, at the option of the undersigned, be void. On receiving the payments above specified the undersigned will turn over to the said Beebe or his nominee stock covered by said payments, fractional shares in all cases to be retained by the undersigned."

[1] The option was signed by defendant as syndicate manager, but the names of the syndicate members were not given in the option nor disclosed to the plaintiff. Accordingly the plaintiff may proceed upon the contract against the defendant personally if it is enforceable at all.

The option agreement does not make the plaintiff a member of the syndicate itself. The defendant agrees to deliver to the plaintiff stock of the mining corporation at 17½ cents per share, and not a participating share in the venture and assets of the syndicate.

The plaintiff made his first payment of $437.50 April 4th, but paid nothing further until June 26th, when $3,500 was paid, and July 8th, $3,500 more. These last payments were for stock sold to Messrs. Chase and Wiard through the efforts of the plaintiff; and it has been contended on the part of the defendant that those payments should not be credited upon the option agreement. But it is made very clear by the correspondence between the parties that plaintiff and defendant both understood at the time that those payments were procured by the plaintiff and forwarded to the defendant in pursuance of the option. Chase and Wiard did not wish to accept the form of certificate which had been forwarded to the plaintiff for them, a form which was used for interim purposes by the defendant for syndicate stock that was purchased; and accordingly the stock for 40,000 shares was issued by the corporation directly to Chase and Wiard. To replace that stock the defendant returned to the corporation certificates for 40,000 shares, which he had procured and then held as syndicate manager. The drafts for $7,000 which came from Wiard and Chase were payable to the order of defendant personally, and were turned over by the plaintiff to the defendant, who used $4,625 of the proceeds in payment upon a note for money originally used by him for the purchase of syndicate stock, and the balance, $2,375, defendant forwarded to the treasurer of the corporation in payment for additional stock, which was issued to him as syndicate manager; so only one conclusion can be drawn from the transaction itself—that the payments for the Chase and Wiard stock should be allowed to the plaintiff pro tanto upon the option.

About May 4 one share of the stock was issued by the corporation to the plaintiff. It seems probable that that single share was issued to qualify him on the books as a director, to which position plaintiff was elected about that time. No other formal certificate of stock had been

issued to the plaintiff up to that time; the certificate for the stock which plaintiff had paid for April 4th being held by the defendant as syndicate manager, who later gave plaintiff a receipt for the same in the form which was attempted to be used in the Chase and Wiard transaction. Treating the single share of stock issued May 4th by the corporation as a negligible factor in the case, the $7,000 received from Chase and Wiard completed payment for the first, second, and third blocks of 10,000 shares each, paid the first three installments on the fourth block, and the first two on the fifth, leaving the sixth, seventh, and eighth blocks with nothing paid on them. Nothing further was paid, and no amount tendered in any form until November 30th, when a draft for $3,500 was sent by the plaintiff to defendant, payable to his order as treasurer of the mining corporation. November 1st plaintiff wrote defendant that, as it was the first of the month, he was reminded that he ought to send defendant some more money, and that as it would be necessary for him to borrow the balance required under their agreement, he wished to know what he could safely figure on in the line of returns before January 1st. Defendant's reply does not contain any disaffirmance of any further rights under the agreement, and counsel for the plaintiff calls it "evasive." It contains no promise to accept further payments. Defendant was elected a director of the corporation in May, 1912, and was also then elected president, which office he has ever since retained, and was exercising the duties of treasurer as well in November, 1912. From the time the option was signed down to November 30th numerous letters passed between the parties with relation to the mine and its prospects, and the letters written by defendant recognized, apparently, that plaintiff had a material interest in the future success of the mine which, of course, he did, even if he held no more than 2,500 shares, but which would be much greater if he had the opportunity still open to buy more shares if the mine proved a success.

At the mine, on or about October 11, 1912, a thread of ore was broken into, which, it was later found, led into a vein which subsequently, as development went on, turned out to be very productive. October 15th a large amount of stock was issued to three individuals on the eve of a directors' meeting. Over 200,000 shares were thus disposed of, out of which 100,000 shares were issued to two nominees of the defendant for his benefit. About half of the 100,000 shares thus issued the defendant sold in the month of October to various persons; but none for more than 17½ cents per share. The mining stock soon became very attractive; and, if plaintiff had the right to call upon defendant for 32,499 shares for 17½ cents per share, it was a very valuable right.

After the Chase and Wiard money was received, there was no demand made by the defendant of plaintiff for more money, and nothing occurred in the nature of a repudiation by him of any further rights under the option until some time in November. Plaintiff's explanation of the form of the draft tendered November 30th is that earlier in that month, in a personal conversation, the defendant had told him

that he had no stock which he could deliver to him under the option, and that if he got more stock he would have to get it from the company.

[2] It is argued by the plaintiff's counsel with great earnestness that the acceptance of belated payments and the course of business, including the correspondence which has been referred to, constitute a waiver of the strict terms of the option so far as the time of payment is concerned; and, inasmuch as there was no demand made by defendant upon the plaintiff for money, and no notice of an intention to claim a default and terminate the option had been given by defendant, the defendant should not be permitted in equity to claim a forfeiture. On the other hand, it is contended with equal earnestness that nothing in the interval between the signing of the option in April and the 1st of November, 1912, was said or done by defendant before the final default occurred which was naturally calculated to put the plaintiff off his guard, or to invite delay in making other payments; that there was no inducement or holding out for delay, and hence no estoppel upon the defendant in claiming a forfeiture of the option; and in this respect defendant relies upon the familiar principle, which seems to be universally recognized that in an option to purchase mining property time is always to be considered to be of the essence of the contract, on account of the liability to great fluctuation in value, and that words are not necessary in the written option itself to make timely performance essential, for that is implied because of the nature of the property involved. Waterman v. Banks, 144 U. S. 394, 12 Sup. Ct. 646, 36 L. Ed. 479; Pomeroy on Contracts, p. 459.

It is not necessary for the decision of this case that the court determine whether the defendant had waived strict performance as to the entire balance of the stock. To say the least, it is doubtful if the facts constitute a waiver or extension of time with regard to the blocks of stock on which nothing had been paid or delivered. As to blocks on which there had been partial payments, or out of which there had been partial deliveries, perhaps plaintiff might have been better fortified in claiming the right to the remaining shares; but, as to his right to all the undelivered stock, there was that uncertainty and doubt which furnished the inducement for the settlement of the whole matter thereafter affected.

[3] It seems that at and just prior to a meeting of directors held December 14, 1912, the plaintiff asserted to the other directors that, in view of his efforts in procuring capital that was utilized in the development of the mine and in making the discovery of rich ore possible, he was entitled to special consideration from the board of directors; and, although the stock was then believed to be worth more than 17½ cents per share, he asked for an allotment of 20,000 shares at that price as a return for his early faith in the enterprise and his contributions toward its success. It was also asserted by him, and known to the other directors, that he made some sort of a claim upon the defendant personally by reason of the option. There is a dispute as to what the plaintiff said with reference to his alleged claim against the defendant, but

that dispute is not material here, because the fact is made clear that some sort of a claim was asserted, and that the assertion thereof was understood by the directors. At the meeting, in the presence of plaintiff and defendant, one director stated that in his opinion 5,000 shares would be adequate as an allotment to plaintiff; but finally, after consideration and discussion, a resolution was introduced and carried as follows:

"That 10,000 shares of the company's treasury stock be allotted and issued to Mr. G. H. Beebe at 17½ cents a share, it being understood that same is in full satisfaction of Mr. Beebe's alleged claim against Mr. Worth or the company."

No protest was made nor objection taken by plaintiff to the wording of the resolution.

The 10,000 shares of stock then voted to the plaintiff were issued by the corporation and received and paid for by him December 27, 1912, at 17½ cents per share. At a stockholders' meeting held February 14, 1913, at Toronto, the issuing of these shares to the plaintiff at that price was discussed, and at his request his name was included with the names of all others who had received certificates prior to that time in a general resolution confirmatory of the issuance of all that stock. He continued to hold the 10,000 shares received December 27th until after the commencement of this action when, with full knowledge of all the facts surrounding the transaction, he disposed of that stock as his own to other parties, receiving 90 cents per share, and an additional sum for dividends which had been declared, but not yet paid over.

It seems to me that the effect of the receipt of the 10,000 shares December 27th and the retention thereof, and of the proceeds of the sale referred to, with full knowledge of the facts, constitutes an irrevocable accord and satisfaction of plaintiff's claim, and is a complete defense to this action.

[4] It is urged by the learned counsel for the plaintiff that issuance of the 10,000 shares by the corporation furnishes no consideration for the discharge of the obligation of defendant to plaintiff under the option. If the corporation were a mere volunteer in an attempted settlement of a claim against the defendant, he being in no way connected with the settlement by participation or subsequent ratification, the transfer of the stock of the corporation and its acceptance by plaintiff would not be a bar to the present suit. Gordon Malting Co. v. Bartels Brew. Co., 206 N. Y. 528–540, 100 N. E. 457, 461.

But in this transaction the defendant participated. He was present at the discussion of the board of directors, voted for the resolution as a director, and was interested in the consideration as a stockholder of the company, for the stock was then worth more than 17½ cents per share. In Mr. Thompson's treatise on Accord and Satisfaction, Cyc. 1, page 316, the learned author says:

"A number of the earlier decisions, both English and American, lay down the rule without qualification that satisfaction moving from a stranger cannot be pleaded in bar of the debtor's obligation. At the present time this is

not 'the law, either in England or in those states where the decisions were made. It cannot be doubted that if what is given by the stranger is accepted in satisfaction by the creditor, and his act is authorized or subsequently ratified by the debtor, there will be a complete accord and satisfaction of the debt or demand."

The case of Rusk v. Soutter, 67 Barb. 371, is directly in point; and such is assumed to be the rule by the Court of Appeals in the Gordon Malting Company Case.

[5] The comparative value of the stock issued to plaintiff by the corporation pursuant to that resolution, and the amount undelivered under the option, whether greater or less, does not in law affect the validity of the settlement of the claim against defendant. The acceptance of a certainty for an uncertainty is the moving and abundant consideration.

[6] In respect to this settlement it is insisted, also, that plaintiff should not be bound thereby because when he accepted the stock he did not know the real facts concerning the issue of the stock to plaintiff's nominees October 15, 1912, and the ability of defendant to deliver stock under the option. He had learned of his ability to perform at the time the action was commenced, and later, when plaintiff sold the stock at a large advance and pocketed the proceeds. This is an affirmance of the transaction with knowledge of all the facts; and, inasmuch as the defendant is personally interested in the consideration which passed between the corporation and the plaintiff, and is not unaffected by the failure of the plaintiff to offer to return the stock to the corporation, the plaintiff is in no position to maintain this action. If he was deceived into accepting the stock, he must offer to return it before attempting to enforce the claim in settlement of which the stock was transferred to him. Gould v. Cayuga Co. Nat'l Bank, 86 N. Y. 75.