## BLAKE v. PERRIN.

(Circuit Court of Appeals, Second Circuit. April 24, 1917.)

### No. 183.

1. **APPEAL AND ERROR** ⊕═1002—REVIEW—QUESTIONS OF FACT.

Plaintiff's assertion and defendant's denial that defendant employed plaintiff to render services as broker raised a question of fact, which was settled by the verdict for plaintiff.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3935–3937.]

2. **BROKERS** ⊕═44—RIGHT TO COMMISSIONS—REVOCATION OF AUTHORITY.

A letter written by defendant to plaintiff, if treated as a revocation of defendant's offer to pay plaintiff a commission for securing a purchaser of certain machinery, was ineffective, where it did not reach plaintiff until after he had reached an agreement with a purchaser.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 45.]

3. **BROKERS** ⊕═57(2)—RIGHT TO COMMISSIONS—NEGOTIATION OF CONTRACT ON DIFFERENT TERMS.

An agreement which contemplates the production of a purchaser is not fulfilled ordinarily unless a purchaser is produced by the broker who is ready, willing, and able to purchase at the price and on the conditions named by the seller, and if a purchaser is produced who varies these terms the broker is not entitled to compensation, unless the modifications suggested are consented to by the seller, and a contract is entered into upon the altered basis.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 66, 67, 72.]

4. **BROKERS** ⊕═57(2)—RIGHT TO COMMISSIONS—NEGOTIATION OF CONTRACT ON DIFFERENT TERMS.

Plaintiff was not entitled to commissions for procuring a purchaser for machinery for rifling the barrels of rifles, etc., where the purchaser's offer was to pay the price asked only on condition that the equipment would be sent to Canada and set up there and its capacity demonstrated, especially where the purchaser understood that the equipment was for the manufacture of rifles, and not merely for rifling the barrels.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 66, 67, 72.]

5. **BROKERS** ⊕═51—RIGHT TO COMMISSIONS—NECESSITY OF BRINGING PARTIES TOGETHER.

While ordinarily a broker must produce a purchaser, it is immaterial that the proposed purchaser and the principal are never brought together, where the principal prevents the consummation of the contract.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 69.]

In Error to the District Court of the United States for the Southern District of New York.

Action by Howell C. Perrin against Anna M. L. Blake, as executrix. Judgment for plaintiff, and defendant brings error. Reversed.

---

⊕═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The action was commenced by the service of a summons, on January 20, 1915, in the Supreme Court, Westchester county, state of New York. It was removed to the United States District Court for the Southern District of New York on March 16, 1915.

J. Carl Fogle, of Lockport, N. Y. (S. Wallace Dempsey, of Niagara Falls, N. Y., of counsel), for plaintiff in error.

Kiernan & Moore, of New York City (John J. Dwyer, of New York City, of counsel), for defendant in error.

Before COXE, WARD, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge. This action is brought to recover for services which the plaintiff alleges that he rendered to the defendant at his request as a broker in procuring a purchaser for him of certain machinery. The allegation is that he was to sell certain rifling machinery with capacity of 20 rifle barrels per day, drop forgings for making small parts of rifles, stock patterns, etc., which if put into an established shotgun plant would be able to turn out 20 completed rifles per day, together with patents for the sum of $50,000, and that defendant promised to pay the plaintiff a commission of 15 per cent. on $50,000 amounting to $7,500 in case he procured a purchaser. The sale was not consummated, but the plaintiff alleges that "he did find and procure a purchaser ready, willing, and able to purchase said articles for the sum of $50,000." He alleges that his services were reasonably worth $7,500 and that no part of that sum has been paid.

[1] While the plaintiff asserts that defendant employed him to render the services, the defendant absolutely denies that he ever so employed him. That, of course, raised a question of fact, which the verdict of the jury has settled. The jury found a verdict in favor of the plaintiff for $7,500, and judgment for that amount was entered on May 24, 1916. The plaintiff is a real estate broker in the city of New York. The defendant is a manufacturer of rifles of all kinds, including infantry and army rifles. In 1914 his machinery was in storage in New York, and he was waiting for some occasion to arise which would cause a demand for rifles. The plaintiff and defendant had been acquainted for some years, and the plaintiff had leased to defendant office facilities from 1909 to 1912. The defendant having told plaintiff that he was waiting for an opportunity to sell rifles, it occurred to the latter in 1914 that defendant's opportunity had arrived on account of the war. At that time there was a great demand for rifles and equipment, which greatly exceeded the supply. The plaintiff wrote the defendant on November 16, 1914, as follows:

"There is a party in my office, now, who has orders for 1,000,000 rifles; but all the manufacturers are working day and night, and still unable to keep up with the demand. If you will take your machinery out of the storage, my people will provide a factory, ready to install it, and give you orders for all the rifles you can turn out. This is all I can write you in the letter; but it seems to me that, if you ever wanted an opportunity 'to take the tide at the flood,' now is the psychological moment. Please communicate with me immediately, as these people are red hot and ready to do business."

To this the defendant replied on December 4, 1914, as follows:

"Your letter in regard to doing business in the rifle line is received. We are making Washington our headquarters, and are, of course, willing to accept a good contract or sell out stock control in the company. We are sending out catalogues to some of the inquiries and people may communicate with you. If you can throw any business our way, we will give you a good commission."

On December 7th, plaintiff called defendant on the telephone, and it was arranged that the former should meet defendant at Bellerose, Long Island, and in a conversation at that time the defendant was informed that plaintiff had some parties who wanted to buy rifles, and that he could get a contract for as high as 1,000,000 rifles if defendant would manufacture them. The defendant replied that he did not want to go into manufacturing, but that he would sell his equipment. He informed the plaintiff that he had a rifling machine capable of rifling 20 rifle barrels a day, drop forgings for making all the small parts of a rifle, etc., that if put into a shotgun plant it would be able to turn out 20 complete rifles a day, and that he would sell it for $50,000 and pay plaintiff a good commission. The plaintiff informed defendant that he had never sold rifle machinery, and did not know what the commission was, and defendant informed him that it was "15 per cent."

The plaintiff then saw the parties who were to buy the rifles, and tried to get them to purchase the machinery, but they did not want to manufacture. He thereupon got in touch with one Cushman, who had a factory in Kingston, Canada. After an extended conversation about the matter, the plaintiff and Cushman came to an understanding. There is no question but that Cushman was a man of ample financial resources. After Cushman had agreed to buy, the plaintiff tried to get the defendant on the telephone, but did not succeed in reaching him until the next day, December 10th, when plaintiff said to him: "Hello, Mr. Blake; I have sold your rifle machinery." The defendant replied: "Is that so—good, for how much?" The plaintiff said: "For your price—$50,000. I would like to see you right away in regard to closing it up. Can I come over now, or can you come over here?" The defendant said: "I do not want you to come over here. I do not want to make my host's house a business office. I will come over and see you to-morrow morning about 11 or 12 o'clock." After some further conversation about the time and place of meeting, the defendant said: "I will come in Saturday morning, surely, between 11 and 12 at your office."

It appears that on December 9th, the defendant wrote the plaintiff, calling his attention to the fact that the government of the United States was at that time frowning upon the sale of arms to the belligerents, and informing him that, "in view of the serious penalty imposed for such breach of neutrality, it would be wise for me to proceed with all due caution, if it is wise to proceed at all."

[2] This letter the plaintiff thought he received on the morning of December 10th, but was not certain whether he received it before or after the conversation over the telephone. Neither does it appear at what hour the letter of December 9th was mailed. The envelope in which it was received was not preserved. This, however, would not be material. If it be conceded that the letter revoked the defendant's

offer to pay plaintiff a commission if he secured a purchaser, it could have no effect until it was communicated to the plaintiff. Waterman v. Banks, 144 U. S. 394, 12 Sup. Ct. 646, 36 L. Ed. 479. And it was not communicated to him until after the agreement with Cushman.

On December 11th, the day after plaintiff had informed him over the telephone that he had secured a purchaser, the defendant wrote:

"I must decline to conduct any negotiations in regard to the sale of arms or the disposition of my rifle business. I decline to do anything that might be construed as a breach of American neutrality. Please cancel my engagement to meet you Saturday, December 12th. We will drop the whole matter until the attitude of the American government is more favorable to arms manufacturers."

On December 16th, the secretary of the Blake Rifle Company, of which company the defendant was president, wrote plaintiff, saying, among other things:

"To attempt negotiations now would be a waste of your time. Neither you nor we are to blame because within one day of our talk this law against the supply of arms was introduced in Congress. In any case there is a misunderstanding about our supplying machinery for turning out 20 army rifles per day. This is probably due to the fact that you are a real estate agent, and not a machinery or armory expert. A plant to turn out 20 rifles per day would cost about $100,000 for machinery alone. We have no such plant. What we have is a Pratt Whitney rifling machine, whose capacity is about 20 barrels per day. We explained to you that if this machine was put into an established shotgun plant, like that of the Baker Gun Company at Batavia, in a few weeks they would be able to turn out about 20 rifles per day.

"We have no machinery to turn out 20 rifles per day; so, of course, your party will not do business, and surely we do not want him to lose money, even if he did. Our proposition only applied to this man Laughlin, who was supposed to represent the Canadian government, and we declined to sell him arms, and he declines to buy the patents and rifling machine, as he declined the latter propositions. All negotiations were off, and I notified you to that effect at once, and also in regard to antagonism of the American government. With all due respect, you seem unknowingly to persist in getting us to violate American neutrality, which would precipitate no end of trouble for us, as well as for yourself. Wait till the clouds roll by."

This letter defendant testified at the trial he wrote himself, although the secretary signed it. Cushman testified as follows:

The plaintiff explained "that Blake [the defendant], of the Blake Rifle Company, wanted to sell the Blake equipment—machinery, patents, etc., for the manufacture of rifles—and asked me if I was interested in it. I told him that I was interested. He said that it was a complete equipment—that it would manufacture 20 rifles per day. I immediately told him that, if such equipment could be obtained, I would pay the freight to Canada and have it set up, and if it would do as he stated—manufacture 20 rifles a day—I would give him $50,000 for it."

This occurred on December 9th.

[3] An agreement which contemplates the production of a purchaser is not fulfilled ordinarily unless a purchaser is produced by the broker who is ready, willing, and able to purchase at the price and on the conditions named by the seller. If a purchaser is produced who varies those terms, the broker is not entitled to compensation, unless the modifications suggested are consented to by the seller, and a contract is entered into upon the altered basis. In the case under consideration the original offer which the plaintiff says the defendant made was:

1. To sell for $50,000. This sum was acceded to by Cushman.

2. To sell an equipment which would turn out 20 rifles a day. And Cushman testified that was the proposition which was put up to him by the plaintiff, and which he accepted. The defendant says that he authorized the plaintiff to make no such proposition, but represented that his equipment was capable of rifling 20 barrels a day. The trial judge in his charge did not call the attention of the jury to the necessity of Cushman's acceptance of the exact offer made by defendant, and to this variance in the terms shown in the testimony. The difference between a plant that would turn out 20 barrels a day and one that would turn out 20 rifles a day was considerable of a difference. As defendant pointed out in his letter, a plant to turn out 20 rifles a day would have been worth $100,000.

[4] 3. But Cushman's acceptance of what he thought was defendant's offer was conditional, and not absolute. Cushman himself testifies that what he said he would do was that he would pay the freight on defendant's equipment to Canada and have it set up there in a factory, and if it was demonstrated that it would turn out 20 rifles a day he would pay $50,000 for it. This was a serious modification of the defendant's proposal. It involved a shipment of the equipment to a foreign country, beyond the jurisdiction of the domestic courts, and a considerable distance away from where it then was, where it was to be set up and tested, and no provision was made for its return in case Cushman found it unsatisfactory, and, if necessary to return it, there was no provision as to whether the expense should be paid by Cushman or by defendant. It cannot be said that the minds of Cushman and the defendant ever met on the same terms; and for that reason the broker never became entitled to his commission.

[5] We have said that ordinarily the broker must "produce" the purchaser. The cases to that effect are Gunn v. Bank of California, 99 Cal. 349, 33 Pac. 1105; Massie v. Chatom, 163 Cal. 772, 127 Pac. 56; Baars v. Hyland, 65 Minn. 150, 67 N. W. 1148; Flynn v. Jordal, 124 Iowa, 457, 100 N. W. 326; Grindstaff v. Merchants' Invest. & Trust Co., 61 Or. 310, 122 Pac. 46; Watters v. Dancey, 23 S. D. 481, 122 N. W. 430, 139 Am. St. Rep. 1071. In this case the proposed purchaser and the defendant were never brought together. This fact, however, is not material in cases in which the principal prevents the consummation of the contract. Van Orden v. Simpson, 90 Misc. Rep. 322, 153 N. Y. Supp. 134; Duclos v. Cunningham, 102 N. Y. 678, 6 N. E. 790.

As the purchaser the plaintiff found proposed to buy on conditions not contained in the defendant's proposal to sell, and besides misunderstood what was being sold, we must hold that the plaintiff is not entitled to the commission, which the defendant promised to pay if a purchaser was produced who would buy on the terms originally named. The motion to dismiss the complaint, upon the ground that no cause of action by the plaintiff against the defendant had been made out, should have been granted.

Judgment reversed.