# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-2218

_____

| | | |
|---|---|---|
| Alison Brisbin, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the District of |
| Aurora Loan Services, LLC; Mortgage | * | Minnesota. |
| Electronic Registration Systems, Inc.; | * | |
| Federal Home Loan Mortgage | * | |
| Corporation, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: February 15, 2012
Filed: May 21, 2012

_____

Before GRUENDER, BENTON, and SHEPHERD, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Alison Brisbin filed this lawsuit in Minnesota state court against Aurora Loan Services, LLC; Mortgage Electronic Registration Systems, Inc.; and Federal Home Loan Mortgage Corporation (collectively "lender"), seeking legal and equitable relief from the lender's foreclosure and sale of her home. She alleged three legal theories for invalidation of the foreclosure sale (respectively Counts I through III): failure to comply with the notice requirements of the Minnesota foreclosure-by-advertisement

statute, promissory estoppel, and breach of the lender's United States Department of the Treasury Home Affordable Modification Program ("HAMP") Participation Agreement, which Brisbin alleged was intended to benefit her as a third-party beneficiary. She also alleged two legal theories for the recovery of damages resulting from the foreclosure sale (respectively Counts IV and V): negligent misrepresentation and intentional misrepresentation. The lender removed the case to federal court and subsequently moved for summary judgment on all Counts. The district court[1] granted the motion, and Brisbin appeals. We affirm.

## I.    BACKGROUND

Brisbin purchased five homes in the Minneapolis-St. Paul area between 2000 and 2006. This case involves her home on Emerson Avenue, which she purchased in 2006 for $310,000 using a $248,000 mortgage from the lender. Brisbin also obtained a second mortgage in the amount of $62,000. During the housing crisis of 2008, Brisbin became delinquent on her mortgages on this house as well as on three of her other properties. The lender sent Brisbin a letter disclosing alternatives to foreclosure in April 2009. Brisbin contacted the lender in July to seek a forbearance, which the lender denied in early August. Shortly thereafter, however, the lender placed Brisbin into a trial forbearance program. In mid-September, the lender returned Brisbin's payment under the forbearance program, informed her that she did not qualify for forbearance, and served her with foreclosure documents, including a notice scheduling a foreclosure sale for October 23, 2009.

Brisbin contacted the lender on September 25, 2009, to request a loan modification. The lender concedes that it told Brisbin the foreclosure sale would be postponed to give it time to consider her request for a loan modification.

---

[1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

Nevertheless, the lender did not postpone the foreclosure sale, and it purchased the house at the foreclosure sale on the originally scheduled day. The lender's records indicate that it denied Brisbin's loan modification request on October 26, 2009, because "the foreclosure sale ha[d] already been completed." The records also indicate that Brisbin called on October 30 to find out why the loan modification was denied, that the lender then began a review of why the modification was denied, and that the lender did not advise Brisbin that her house had been sold. The lender then arranged for Brisbin to reapply for a loan modification, and she submitted an application on November 23, 2009. On April 16, 2010, the lender informed Brisbin that the foreclosure sale had occurred in October, that she would not receive a loan modification, and that her redemption period would expire on April 23, 2010. On either April 22 or 23, the lender offered to rescind the sale if Brisbin could settle the account that day. Brisbin did not pay, and the foreclosure sale was not rescinded.

On April 23, 2010, Brisbin filed this lawsuit. The lender subsequently moved for summary judgment, arguing that it had provided proper notice of foreclosure, that the Minnesota Credit Agreement Statute ("MCAS") precluded enforcement of its oral promise to postpone the foreclosure sale, and that Brisbin had not demonstrated that she had detrimentally relied on the promise to postpone the sale. Brisbin argued in response that the foreclosure sale was invalid because the lender did not publish notice of the postponement it promised her as required by the foreclosure-by-advertisement statute, that the MCAS did not bar her claims, and that she did detrimentally rely on the lender's promise by failing to attempt to sell the home or borrow money to reinstate the mortgage.

The district court granted the lender's motion for summary judgment in its entirety. In granting summary judgment on Count I, the district court stated that the Minnesota foreclosure-by-advertisement statute provided no basis to invalidate the foreclosure sale, concluding that there was no genuine question of fact that Brisbin was the "party requesting the postponement" and that the lender therefore had no

statutory obligation to publish notice of the postponement. Regarding Count II's claim for promissory estoppel, the district court concluded that the MCAS bars enforcement of the lender's oral promise to postpone the sale. In disposing of Count III, the court held that Brisbin was not a third-party beneficiary of the lender's HAMP Participation Agreement. With respect to Counts IV and V, the court concluded that there was no genuine question of fact as to whether Brisbin detrimentally relied on the lender's promise because she provided no evidence that she would have been able to borrow money to reinstate the mortgage or sell the home if she had tried.

In appealing the grant of summary judgment on Count I, Brisbin contends that the district court erred in concluding that there was no genuine question of material fact as to whether she requested the postponement. With respect to Count II, she contends that the district court erred in concluding that the MCAS bars enforcement of the lender's oral promise to postpone the foreclosure sale. With respect to Counts IV and V, Brisbin contends that the district court erred in concluding that there was no genuine question of material fact as to whether she detrimentally relied on the lender's promise to postpone the foreclosure sale. She does not appeal the decision on Count III.

## II.     DISCUSSION

We review the district court's grant of summary judgment *de novo*. *Taylor v. St. Louis Cnty. Bd. of Election Comm'rs*, 625 F.3d 1025, 1026 (8th Cir. 2010) (per curiam). "Summary judgment is appropriate where, viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Id.* at 1026. The parties agree that we are to apply Minnesota law. *See Kaufmann v. Siemens Med. Solutions USA, Inc.*, 638 F.3d 840, 843 (8th Cir. 2011). We review *de novo* the district court's interpretation of Minnesota law, *Triton Corp. v. Hardrives, Inc.*, 85 F.3d 343, 345 (8th Cir. 1996), and, unless the outcome of the case is dictated by

Minnesota Supreme Court precedent, we "must attempt to predict what that court would decide if it were to address the issue," *Raines v. Safeco Ins. Co. of Am.*, 637 F.3d 872, 875 (8th Cir. 2011).

## A. Postponement Under the Foreclosure-by-Advertisement Statute

Minnesota's foreclosure-by-advertisement statute allows a mortgagee to postpone a previously scheduled foreclosure sale but requires "[t]he party requesting the postponement" to publish notice of the postponement "as soon as practicable" at the party's own expense. Minn. Stat. § 580.07, subdiv. 1. The district court concluded that this requirement did not apply to the lender's foreclosure of Brisbin's house because there was no genuine question of fact as to whether Brisbin requested the postponement when she called the lender to request a loan modification. Brisbin contends that there is a genuine question of fact as to whether she or the lender requested the postponement of the foreclosure sale. She also argues that the requirements of Minn. Stat. § 580.07, subdiv. 1 apply to a mortgagee arranging the postponement of a foreclosure sale regardless of who initially requested the postponement, but she cites no authority construing Minn. Stat. § 580.07, subdiv. 1.

Even if Brisbin is correct that there is a genuine question of fact as to whether she requested the postponement or that the notice requirements in Minn. Stat. § 580.07, subdiv. 1 would apply even if she initially did request the postponement, the requirements of § 580.07, subdiv. 1 were never triggered in this case. A plain reading of the statute indicates that notice of postponement is only required when a foreclosure sale actually is postponed by the mortgagee. *See* Minn. Stat. § 580.07, subdiv. 1. Here, Brisbin's complaint is that the foreclosure sale was *not* postponed. Brisbin offers no authority for construing the statute to invalidate a foreclosure sale that was properly noticed as an original matter and for which no postponement ever occurred. "When the language of a statute is plain and unambiguous, it is assumed to manifest legislative intent and must be given effect." *Beardsley v. Garcia*, 753 N.W.2d 735,

737 (Minn. 2008) (quoting *Burkstrand v. Burkstrand*, 632 N.W.2d 206, 210 (Minn. 2001)). Thus, because there is no dispute as to whether the foreclosure was actually postponed, § 580.07, subdiv. 1 is inapplicable, and we affirm the district court's grant of summary judgment to the lender on Count I.

### B.    Promissory Estoppel

In Count II of her complaint, Brisbin sought to enforce the lender's oral promise to postpone the foreclosure sale under the doctrine of promissory estoppel in order to invalidate the foreclosure sale. She alleged that the lender "affirmatively" told her that "it had put the 'foreclosure on hold' until the modification . . . was approved or denied," and that Brisbin relied on this statement to her detriment by "not attempting" to reinstate or redeem the mortgage. The district court granted the lender summary judgment on this claim because the MCAS prohibits a debtor from "maintain[ing] an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor." Minn. Stat. § 513.33, subdiv. 2. Brisbin contends that the district court erred in concluding that the lender's oral promise to postpone the foreclosure sale was a "credit agreement" governed by the MCAS and rendered invalid for failure to comply with the MCAS's requirements. She argues that the promise to postpone the foreclosure sale is not a "credit agreement" because it "does not concern the actual extension of credit or any financial accommodation." *See Carlson v. Estes*, 458 N.W.2d 123, 127 (Minn. Ct. App. 1990).

We reject Brisbin's argument that a promise to postpone a foreclosure sale is not a "financial accommodation" within the meaning of the MCAS. The MCAS defines "credit agreement" as "an agreement to lend or forbear repayment of money, . . . to otherwise extend credit, or to make any other financial accommodation." Minn. Stat. § 513.33, subdiv. 1(1). Although the phrase "any other financial accommodation" does not expand the application of the statute to all

-6-

agreements favoring the debtor, it "must be interpreted to mean a financial accommodation in the nature of [a] lending or forbearance agreement." *Rural Am. Bank of Greenwald v. Herickhoff*, 473 N.W.2d 361, 362-63 (Minn. Ct. App. 1991) (holding that an agreement to apply payments to one loan before another "is not an agreement to lend or forbear repayment of money"). For example, a promise not to record a mortgage is not a financial accommodation under the statute. *See Carlson*, 458 N.W.2d at 127. In contrast, "promises to forebear repayment . . . or to make any other financial accommodation" include promises to satisfy a loan from equity in the security property before enforcing a personal guaranty, promises to allow an opportunity to cure a loan default, and promises to accept a corporate guaranty instead of a personal guaranty in restructuring a loan. *BankCherokee v. Insignia Dev., LLC*, 779 N.W.2d 896, 902 (Minn. Ct. App. 2010). The term "forbearance" means "[t]he act of refraining from enforcing a right, obligation, or debt." Black's Law Dictionary 717 (9th ed. 2009). Because foreclosure is a means of enforcing a debt, a promise to postpone the foreclosure sale falls squarely within the plain meaning of a forbearance agreement and is thus a "credit agreement" within the meaning of the MCAS. "[S]uch an interpretation is consistent with the statute's broad application." *See BankCherokee*, 779 N.W.2d at 902.

Brisbin contests this reading of the MCAS because the lender "would still retain its contractual right to foreclose on the Subject Property once the review process for Brisbin's mortgage note was complete." This argument is not persuasive because the nature of a forbearance agreement, an agreement to temporarily refrain from enforcing a debt, is such that the agreement does not necessarily negate the underlying contractual obligation for eventual repayment. That the oral promise did not permanently preempt foreclosure proceedings does not remove the promise from the realm of "credit agreements" within the meaning of the statute.

Brisbin also contends that the oral agreement to postpone the foreclosure sale was not a "credit agreement," claiming the MCAS expressly excludes it in subdivision 3. *See* Minn. Stat. § 513.33, subdiv. 3(a). Contrary to Brisbin's contention, subdivision 3 does not carve out exceptions to the definition of "credit agreement" given in subdivision 1. Instead, subdivision 3 provides examples of agreements specifically covered by the statute. Subdivision 3 states: "The following actions do not give rise to a claim that a new credit agreement is created, unless the agreement satisfies the requirements of subdivision 2: . . . (3) the agreement by a creditor to take certain actions, such as . . . forbearing from exercising remedies under prior credit agreements . . . ." *Id.* Rather than excluding agreements to forbear exercising remedies under prior credit agreements from the definition of "credit agreement," subdivision 3 expressly subjects them to the requirements of the statute. *See id.* Thus, this argument is also unpersuasive.

Finally, Brisbin contends that the legislature did not intend the MCAS to bar enforcement of oral promises when there is no dispute that the oral promise was made. Brisbin argues that the purpose of the statute is to prevent debtors from defrauding lenders and that no such purpose can be served here because the lender's own records confirm its promise that the foreclosure sale would be postponed. However, "[w]e can disregard a statute's plain meaning only in rare cases where the plain meaning utterly confounds a clear legislative purpose." *Toth v. Arason*, 722 N.W.2d 437, 442 (Minn. 2006) (alteration in original) (quoting *Weston v. McWilliams & Assocs. Inc.*, 716 N.W.2d 634, 639 (Minn. 2006)). Minnesota courts have recognized a clear legislative purpose behind the MCAS to "prevent borrowers from using an ongoing lending relationship with a lender to enforce unwritten agreements" extending credit or promising forbearance of repayment. *Herickhoff*, 473 N.W.2d at 363. Here, applying the statute according to its plain meaning would not "utterly confound" this clear legislative purpose.

Thus, we conclude that the MCAS prohibits the enforcement of an oral promise to postpone a foreclosure sale and that the lender was entitled to summary judgment on Brisbin's promissory estoppel claim. *See BankCherokee*, 779 N.W.2d at 903 (holding that "an oral promise that constitutes a 'credit agreement' under section 513.33 cannot be enforced under a theory of promissory estoppel").

### C. Negligent and Intentional Misrepresentation

The district court rejected Brisbin's negligent and intentional misrepresentation claims, concluding that her affidavit testimony that she would have "attempted" to borrow money from friends, obtain a loan, or sell her home was "little more than conjecture insufficient to defeat summary judgment." The court explained that her "conclusory assertion lacks any factual support, such as affidavits from individuals indicating a willingness to lend money to her." The court reasoned that Brisbin had admitted to being thousands of dollars behind on her payments and presumed that if she had the ability to borrow such a large sum she would have done so long before the foreclosure sale was imminent. Brisbin contends on appeal that her affidavit raised a genuine question of material fact on this issue.

Although Brisbin swore in her affidavit that the lender's promise to postpone the foreclosure sale induced her not to ask friends to lend her money, that she would have attempted to borrow money from friends if not for the lender's promise, and that she was "very confident" that she would have been able to borrow a sufficient amount of money from friends to reinstate the loan, this self-serving affidavit was not sufficiently specific to raise a genuine question of material fact in the face of uncontradicted facts in the record. Brisbin was at least $8,000 in arrears on her payments at the time she received notice of the foreclosure sale in September 2009, and she admitted in her deposition that she could not reinstate the loan with personal or family funds. Furthermore, Brisbin admitted that she lost two other homes to foreclosure during this period despite marketing them for sale and subsequently was

denied bank loans that were a prerequisite to establishing a payment plan with the Internal Revenue Service for delinquent taxes. Her conclusory statement that she is "very confident" that unnamed friends would have loaned her sufficient money to reinstate the loan is belied by her inability to address her mounting debts during this same period. Thus, in the context of the entirety of the record, Brisbin's affidavit provides no more than "mere speculation, conjecture, or fantasy" that she would have been able to raise the thousands of dollars necessary to reinstate the loan. *See Binkley v. Entergy Operations, Inc.*, 602 F.3d 928, 931 (8th Cir. 2010) (quoting *Godfrey v. Pulitzer Publ'g Co.*, 276 F.3d 405, 412 (8th Cir. 2002)). Without a more concrete statement of how she would have raised such large amounts of money to contradict the overwhelming evidence that reinstatement of the mortgage was impracticable, Brisbin did not raise a genuine question of material fact as to whether she detrimentally relied on the lender's promise.[2]

## III.   CONCLUSION

For the foregoing reasons, we affirm.

_____

_____

[2]Brisbin argues for the first time on appeal that she detrimentally relied on the lender's promise to postpone the foreclosure sale by foregoing her statutory right to postpone the foreclosure sale for five months, *see* Minn. Stat. § 580.07, subdiv. 2, and by not filing for bankruptcy before the redemption period on her home ended. "Absent exceptional circumstances," not present here, "we cannot consider issues not raised in the district court." *Shanklin v. Fitzgerald*, 397 F.3d 596, 601 (8th Cir. 2005). Moreover, Brisbin identifies no evidence in the record, including her affidavit, indicating that she considered declaring bankruptcy or invoking her statutory right to postpone the foreclosure, or that the lender's promise specifically induced her to forego these options.