WELLS, Chief Judge.
Rogelio Vargas appeals from an order approving a general magistrate’s report and recommendation on his post-final judgment “Motion to Enforce Loan Modification Agreement Entered into in Open Court.” We affirm for three reasons: first, because the court below was without authority to entertain Vargas’ multiple motions to force or enforce a loan modification agreement after a foreclosure judgment became final; second, because there is no evidence that the lender bank agreed to a modification of the underlying loan on the foreclosed property “in open court” at a post-judgment hearing; and third, because Vargas’ claim that he entered into a modification of his loan agreement “in open court” is barred by the applicable statute of frauds.
On July 28, 2006, Vargas and his wife borrowed nearly a quarter of a million dollars — $232,000—from First NLC Financial Services, LLC. As a condition of receiving this substantial sum of money, Vargas and his wife executed a promissory note, agreeing to repay the loan on a monthly basis. Vargas and his wife simultaneously executed a mortgage securing repayment.[1]
After complying with their obligations under the note and mortgage for little more than a year, Vargas and his wife failed to make any promised payments after September 1, 2007. On December 21, 2007, Deutsche Bank brought suit to foreclose the mortgage. Mrs. Vargas failed to answer and a default was entered against her. Mr. Vargas answered and raised four affirmative defenses, none of which have been argued here.[2]
On March 20, 2008, Deutsche Bank’s motion for summary judgment was heard. At that time, the original promissory note was surrendered to the lower court; and, based on the uncontroverted affidavits submitted by Deutsche Bank, a final judgment of foreclosure was entered. The foreclosure judgment set the public sale of the property for June 18, 2008.
At Deutsche Bank’s request, the sale date was twice reset, the last setting for November 19, 2008. In the interim, Ocwen Loan Servicing, LLC (apparently the servicing agent for this loan) offered to modify the Vargases’ loan, providing them with a written modification agreement, dated October 1, 2008. Importantly, the cover letter attached to the offered loan modification provided that the Vargases must accept the offer by October 24, 2008, as the offer expired on that date:
The U.S. Government has recently introduced many new programs designed to
*1159 help homeowners like you who are struggling to make their monthly mortgage payments.
Ocwen is not only cooperating with the Government, we are attempting to exceed expectations....
[[Image here]]
You have been selected to receive a special “STREAMLINED LOAN MODIFICATION” that will lower your mortgage payment....
[[Image here]]
ACT NOW because this offer is part of a specialized initiative program that ends on October 24, 2008. There are other options that are part of this initiative program, but the KEY IS TO ACT NOW, because all of the options are tied to the initiative program, and it ends October 24, 2008.
What you should do.
To take advantage of this offer you must read, understand and sign the attached agreement. You must also send us the first month’s payment. A loan modification changes the original terms of your mortgage, so please make sure you read and understand all the new terms.
(Emphasis added).
The unsigned agreement attached to the cover letter stated the principal balance due on the loan as modified would be $267,939.14, an amount greater than both the principal amount due on the original now defaulted loan ($230,596.06) and the total amount due under the foreclosure judgment ($248,840.88), which had been accruing interest since the lower court entered the final judgment on March 20, 2008. The modification agreement also contained a waiver and release of all claims against the lender:
LOAN MODIFICATION AGREEMENT
Ocwen Loan Servicing, LLC (“Ocwen”) is offering you this Loan Modification Agreement (“Agreement”), dated October 1, 2008 which modifies the terms of your home loan obligations as described in detail below:
[[Image here]]
Pursuant to our mutual agreement to modify your Note and Mortgage and in consideration of the promises, conditions, on terms set forth below, the parties agree as follows:
1. In order for the terms of this modification to become effective, you promise to make an initial down payment (“Down Payment”) of $1, 207.38 on or before October 24, 2008 and 2 equal monthly payments of principal and interest in the amount of $1,207.38 to Ocwen (“Trial Period”) beginning on December 1, 2008, and thereafter due on the l[st] day of each succeeding month.
2. If you successfully complete the Trial Period, your loan will automatically be modified pursuant to the terms of this Agreement....
3. You agree that, at the end of the Trial Period, the new principal balance due under your modified Note and Mortgage will be $267,939.14
[[Image here]]
10. BY EXECUTING THIS MODIFICATION, YOU FOREVER IRREVOCABLY WAIVE AND RELINQUISH ANY CLAIMS, ACTIONS OR CAUSES OF ACTION, STATUTE OF LIMITATIONS OR OTHER DEFENSES, COUNTERCLAIMS OR SETOFFS OF ANY KIND WHICH EXIST AS OF THE DATE OF THIS MODI-FICTION, WHETHER KNOWN OR UNKNOWN, WHICH YOU *1160 MAY NOW OR HEREAFTER ASSERT IN CONNECTION WITH THE MAKING, CLOSING, ADMINISTRATION, COLLECTION OR THE ENFORCEMENT BY OCWEN OF THE LAON DOCUMENTS, THIS MODIFI-CAITON OR ANY OTHER RELATED AGREEMENTS.
(Emphasis added).
Vargas did not accept the offer. He neither executed the agreement by October 24, 2008, nor made the initial payment required by that date. Instead, on November 5, 2008 — well after the loan modification offer had expired — he filed a motion styled “Motion to Stay Foreclosure Sale and to Compel Reasonable Forbearance Agreement,” in which he acknowledged his refusal to accept the offer in its current form and requested the trial court to compel an offer that Vargas would accept:

MOTION TO STAY FORECLOSURE SALE AND TO COMPEL REASONABLE FORBEARANCE AGREEMENT

The Defendant, ROGELIO VARGAS, by and through his undersigned counsel, hereby files this Motion to Stay Foreclosure Sale and Compel Reasonable Forbearance Agreement, and in support thereof state[s] as follows:
1. An Order granting Plaintiffs Motion for Summary Final Judgment of Foreclosure was entered by this Court on March 20, 2008. According to this Order, within sixty (60) days, the bank was to provide the Defendant a Forbearance packaged[3]]
2. On October 1, 2008, more than sixty (60) days after this Court’s Order, the Plaintiff provided a Loan Modification Agreement to the Defendants....
3. The aforesaid Loan Modification Agreement is unreasonable and the Defendant cannot enter into such an agreement unless modifications are made to the unreasonable terms contained therein.
4. Pursuant to paragraph 3 of the Loan Modification Agreement “the new principal balance due ... will be $267,939.14[.”]
5. Under the Final Judgment of Foreclosure, the grand total set forth in said judgment is $248,840.88. This means the loan modification is approximately $19,000.00 more than the amount set forth in the Summary Judgment Order and is unreasonable.
[[Image here]]
7. Pursuant to paragraph 10 [of the Loan Modification Agreement], the Defendants are waiving any and all rights and claims that may rise in connection with the mortgage or loan modification agreement, which in effect serves to release the Plaintiffs from any and all liability in the event they engage in some wrong doing concerning this matter. This is an unreasonable term for the Defendant to accept and agree.
[[Image here]]
WHEREFORE, the Defendant, ROGELIO VARGAS, respectfully requests that his Honorable Court enter an Order Staying the Foreclosure sale that is currently set for November 19, 2008 and compel the parties herein to negotiate a loan modification agreement *1161 that is acceptable to both parties within thirty (30) days of this Order....
(Emphasis added).
The foreclosure sale was reset for February 12, 2009. On January 14, 2009, Vargas filed a second post-judgment motion, styled “Second Motion to Stay Foreclosure Sale and to Compel Reasonable Forbearance Agreement.” In that motion, he again acknowledged his refusal to accept the now-expired loan modification offer and again asked the trial court to compel Deutsche Bank to offer him a better deal. This motion, using identical language, lodged the same objections that his first post-judgment motion had raised about the terms of the October 1, 2008 offer to modify his loan. The motion additionally claimed that Vargas’ counsel had “diligently attempted to obtain a reasonable forbearance agreement but to no avail.” As of the filing of this motion, Vargas had made no payments to Deutsche Bank for at least sixteen months; the mortgage on his home already had been foreclosed for almost a year; and, he concededly had been unable to reach an agreement with the bank to modify his loan.
On January 29, 2009, Vargas’ second motion to postpone the February 12th public sale and to compel what he deemed a “reasonable” settlement was heard. The lower court summarily denied the motion, ordering the public sale to proceed as scheduled on February 12. Eleven days later, just three days before the scheduled sale, Vargas filed an unverified “Emergency Motion to Postpone Sale” in which he represented that at the January 29th hearing on the second motion to postpone sale, the “Parties’ respective counsels [ajgreed in open Court to the terms of the Loan Modification Agreement, offered to the Defendant’s [sic] on October 1, 2008,” with the only pending issue being “whether to apply the first payment to the first of March or upon receipt.” Vargas further alleged that he “had signed the October 1, 2008 agreement as stipulated to in Open Court and attached payment as instructed.” Two days later, and without a ruling on his latest attempt to postpone the foreclosure sale, Vargas filed for Chapter 11 Bankruptcy protection, thereby automatically postponing the foreclosure sale that was to take place the next day.
Thereafter, and while the bankruptcy was pending, Vargas sent checks each month to Ocwen in the amount stated in the October 1, 2008 modification offer. Ocwen accepted some checks, and then returned others with notices that the checks sent did not cure Vargas’ default. Ultimately, Ocwen returned all of the checks following termination of the bankruptcy proceeding.[4]
In early July 2009, apparently with the bankruptcy proceeding and the accompanying stay of the foreclosure sale terminated, Vargas filed yet another post-judgment motion, styled “Motion to Enforce Loan Modification Agreement Entered into in Open Court.” Therein, Vargas sought to enforce the modification agreement which he claimed was entered into at the January 29th hearing and which only he had signed. The motion was referred to a general magistrate for the purpose of determining whether the parties had “entered into a valid and binding Loan Modification Agreement in open court during the course of the January 29, 2009 hearing.”
On February 1, 2010, the general magistrate conducted an evidentiary hearing on the matter. No transcript of the January *1162 29, 2009 hearing was filed or introduced at that hearing, and only Vargas testified. The totality of Vargas’ testimony was that, at the January 29th hearing: he had agreed to accept the then long-expired October 1, 2008 loan modification offer; he had stricken out that portion of paragraph 1 of the proposed agreement which required him to make his initial payment by October 24, 2008; he had signed the agreement; and he had begun sending in monthly checks. There was no testimony that Ocwen had agreed to renew its previous offer; that Ocwen had agreed to modify its loan as of January 29, 2009 for $267,939.14, the same amount it had been willing to modify it for on October 24, 2008, essentially forgoing any additional costs it had incurred, and all additional interest that had accrued since October 2008; or that Ocwen had agreed to strike the October 24th payment date contained in paragraph 1 of the agreement:
BY MR. HERRERA [COUNSEL FOR VARGAS]:
Q. Mr. Vargas, on January 29th, were you present before Judge Silverman in his courtroom?
A. Yes.
Q. Was the purpose of your presence in the courtroom related to the foreclosure on your property?
A. Yes.
[[Image here]]
Q. When you sat before Judge Silver-man with counsel for the Plaintiff in front of you[ ] did you have the opportunity to accept the loan modification agreement?
A. Yes.
Q. And did you in fact accept that modification agreement?
A. Yes.
Q. Have you made payments based on your acceptance of that modification agreement?
A. Yes.
Q. Is the payment history what has been demonstrated to the Court along with the letters of $1,207.38 per month?
A. Yes.
Q. Have you made those payments pursuant to your agreement entered into in open court on January 29th every month?
A. Yes.
MR. HERRERA: I have no further questions.
GENERAL MAGISTRATE: Okay. Ms. Walke.
CROSS EXAMINATION
BY MS. WALKE [COUNSEL FOR DEUTSCHE BANK]:
Q. Mr. Vargas, do you have any written — do you have any written terms of this settlement agreement?
A. Well, he has it because I received the agreement and everything that I received from the people, I gave it to my attorney.
Q. When you were in front of Judge Silverman and you entered into this proposed agreement, do you have anything in writing from that day?
A. Like I said, the agreement is what I have.
Q. Are you referring to the loan modification agreement, let’s see, dated October 1st, 2008? I’ll hand you a copy. Is that the agreement in writing that you’re referring to?
A. That one, and I think we have another one.
MR. HERRERA: Let me see.
BY MS. WALKE:
*1163 Q. Can you ask your counsel if you have another agreement that’s in writing?
GENERAL MAGISTRATE: Communications between a client and counsel typically are privileged. So what’s the October 1st, 2008 copy of the agreement?
MR. HERRERA: Your Honor, I think it would have been easier for a setup of initial argument before Mr. Vargas started his testimony.
GENERAL MAGISTRATE: Okay. I have that, that’s attached as Exhibit A.
MS. WALKE: Correct.
BY MS. WALKE:
Q. Mr. Vargas, can you explain, do you have any other written agreements to modify the loan except for this loan modification agreement dated October 1st, 2008? I’ll hand you the agreement so you can look it over again.
A. This one, this one.
MR. HERRERA: Right.
BY MS. WALKE:
Q. The one that you’re pointing to, is that the same agreement as the October 1st, 2008 agreement with the exception of paragraph one that has a strike through the October 24th, 2008 due date?
A. Right.
Q. That’s correct?
A. Right.
[[Image here]]
MS. WALKE: That’s all I have for now, Your Honor.
[[Image here]]
REDIRECT EXAMINATION BY MR. HERRERA:
Q. Mr. Vargas, was it your understanding at the hearing where you agreed to the loan modification that it was from that point forward?
A. Yes.
Q. Is that the reason we crossed out the date of October 24, 2008?
A. Yeah, that’s it.
MR. HERRERA: No further questions. GENERAL MAGISTRATE: Okay. That’s the sum total of the Defendant’s testimony?
MR. HERRERA: That’s it, that’s all.
On February 18, 2010, the magistrate issued a seven-page report and recommendation, concluding that there was no credible evidence to support Vargas’ claim that the parties had agreed to a loan modification at the January 29, 2009 hearing:
6. In support of their Motion to Enforce, Defendants assert that at the time of the January 29, 2009, hearing, Mr. Vargas executed the Loan Modification Agreement “in open Court” and that the Agreement was accepted by Plaintiffs counsel. However, Mr. Vargas offered no testimony that he signed the Loan Modification Agreement in the presence of Judge Silverman or that the Court observed his signing the Agreement or observed some sort of a settlement. Mr. Vargas offered no testimony as to what, if anything, was said by Plaintiff’s counsel and did not testify as to what actions by Plaintiff’s counsel he relied upon to believe that Plaintiffs had accepted an OCWEN form Loan Modification Agreement that by its terms expired on October 24, 2008.
7. On February 5, 2009, Defendants’ counsel’s employee, Irene Viera, sent an e-mail to OCWEN employee Cindy White. Following the salutation, Ms. Viera’s e-mail states, “As per the request of the Judge Scott J. Silverman, attached please find the Modification Agreement of the above mentioned borrower our client.” However, Ms. Viera’s e-mail also acknowledged that “... this *1164 agreement is expired. I spoke w/Sachin Timple from Ocwen and he stated that there is no record of such in the system.” Ms. Viera’s letter also acknowledged that the foreclosure sale date remained scheduled for February 12, 2009.
8. On February 6, 2009, Defendants’ counsel sent a letter to OCWEN which enclosed Defendants’ executed Loan Modification Agreement and first payment and represented “[m]y clients have accepted said modification and we have stipulated to this in open court before Honorable Scott J. Silver-man on January 29, 2009.” In his letter, Defendants’ counsel stated that he had made numerous but unsuccessful efforts to resolve the question of whether to apply Defendants’ payment to the new date of March 1 or immediately upon receipt with both “your local counsel and the attorney of record on the case, “but to no avail.” The Magistrate finds it significant that neither Plaintiffs counsel nor OCWEN’s counsel were copied on Defense counsel’s letter to OCWEN.
9. Three days later, on February 9, 2009, Defendants filed their (third) Emergency Motion to Postpone Sale- in which they argued that the parties’ counsel “[a]greed in open Court to the terms of the Loan Modification Agreement” and that “[t]he only pending issue was whether to apply the first payment to the first of March or upon receipt.” Two days later, on February 11, 2009, the Defendants filed their Chapter 11 Bankruptcy Proceeding which automatically stayed the February 12, 2009, foreclosure sale as a matter of law.
10. Thereafter Defendants’ counsel sent a series of letters to OCWEN enclosing Defendants’ payments, often referencing or implying that Judge Silver-man had approved the loan modification in open court, and seeking to resolve any outstanding problems. The Magistrate finds that while OCWEN did accept some payments made by the Defendants during the period of their bankruptcy, once their bankruptcy proceeding .was either discharged or dismissed, all of the Defendants’ payments were returned. On December 12, 2009, Defendants’ counsel again wrote to OCWEN enclosing payments from May 2009 through December 2009 which had been “mistakenly returned” by OCWEN and a payment for January 2010. As was the case with his April 2009 letter, Defendants’ counsel did not copy Plaintiffs counsel or OCWEN’s counsel on the May through December 2009 letters.
11. The only exhibit which appears to support Defendants’ argument of a settlement is an OCWEN Account Statement dated October 19, 2009, which reflects a monthly payment due of $1,207.38. However, this document also states “Our records indicate that your loan is in foreclosure.[”] Accordingly, this statement may be for informational purposes only.[ ] (Emphasis supplied) -
12. Based upon the preceding findings, the Magistrate denies Defendants’ Motion to Enforce the Loan Modification Agreement under circumstances where the Court’s January 29, 2009, Order denied Defendants’ Second Motion to Stay Foreclosure Sale and expressly held, “Sale shall proceed February 12, 2009.” Defendants’ actions seeking bankruptcy protection and their counsel’s employee’s e-mail which acknowledged the pending sale date are consistent with an understanding that no enforceable settlement of the foreclosure action had ever been reached.
13. The Magistrate finds that there is no evidence of a meeting of the minds upon an agreement to modify the Defendants’ loan, either orally (under circum *1165 stances which require modification of the loan agreement in writing) or in writing. The fact that Mr. Vargasf ] executed and delivered an expired Loan Modification Agreement and the insistence of Defendants and their counsel that the agreement had been entered into in open court and that their written communications were some how based upon the request or instructions of Judge Silverman manifest an attempt to create the appearance of an agreement where none ever existed or to create the circumstances to support a defense of equitable es-toppel. Whether Defendants’ creation of a self-serving paper trail flowed from misguided optimism or resulted from a deliberate attempt to manipulate the system is immaterial. Simply stated, because there is no credible evidence of a modification of Defendants’ loan on January 29, 2009, “in open court” or thereafter, Defendants’ Motion to Enforce Loan Modification Agreement Entered Into in Open Court is denied.
(Emphasis added).
Vargas’ exceptions to this report and recommendation were denied and it was ratified by the trial court.
Our standard of review on Vargas’ appeal from the trial court order is abuse of discretion. See Collado v. Pavlow, 951 So.2d 69, 70 (Fla. 5th DCA 2007) (finding that “in reviewing a trial court’s adoption and ratification of a general magistrate’s report and recommendation, the standard of review is abuse of discretion”); see Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980) (confirming that discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, in other words where no reasonable person would take the view adopted by the trial court). Based on controlling law and the record before us, we find no abuse of discretion in the trial court’s order and affirm for a number of reasons.
First, the court below had no authority to consider any of Vargas’ post-judgment requests to compel Deutsche Bank either to offer a modification agreement or to enforce any purported post-judgment modification. The final judgment entered below is a standard foreclosure judgment. It determines the amount of principal and interest due through the date of the judgment; it determines the amounts due to cover other costs associated with the property and the foreclosure . action; and, it orders the property sold to satisfy the total amount due at a public sale to occur no sooner than ninety days from the date of entry of the judgment. This judgment does not mention a forbearance package, much less require Deutsche Bank “within sixty (60) days ... to provide [Vargas with] a Forbearance package,” as Vargas alleged in both of his “Motion[s] to Stay Foreclosure Sale and to Compel Reasonable Forbearance Agreement.”
Trial courts do, of course, have the authority to enter orders to enforce to their judgments. See Nieves v. Crawford, 20 So.3d 874, 876 (Fla. 3d DCA 2009) (recognizing that the trial court has the inherent authority to enforce its previously entered order); Spencer v. Spencer, 898 So.2d 225, 227 (Fla. 2d DCA 2005) (providing that the lower court “has the inherent jurisdiction to enforce its previously entered orders, even in the absence of an express reservation of jurisdiction in a final judgment”). They do not, however, have the power, absent an appropriate motion under Florida Rules of Civil Procedure 1.530 or 1.540, to modify a judgment once it becomes final. See Levy v. Levy, 900 So.2d 737, 745 (Fla. 2d DCA 2005) (“Trial courts have no authority to alter, modify, or vacate a final judgment except *1166 as provided in Florida Rules of Civil Procedure 1.530 and 1.540.”); Harbor Bay Condos., Inc. v. Basabe, 856 So.2d 1067, 1069 (Fla. 3d DCA 2003) (“A trial court does not retain the authority to amend or modify a final judgment, absent a rule or statute providing otherwise.”); Frumkes v. Frumkes, 328 So.2d 34, 35 (Fla. 3d DCA 1976) (“The court retains the power to modify by subsequent order the time and manner of the enforcement of a final judgment after it becomes final, but it does not retain the power, unless provided by statute or rule, to amend, modify or alter the provisions of a final judgment.”).
Because the judgment at issue here does not mention a loan modification agreement or a forbearance package, much less obligate Deutsche Bank to provide them to Vargas, there was nothing for the court below to enforce regarding the offer, terms, or acceptance of any modification agreements or forbearance packages. Nor was an appropriate motion under Rules 1.530 or 1.540 ever filed to modify the final foreclosure judgment. Further, because Vargas raised no issues regarding either the pending sale of the subject property or his ownership rights, there was nothing for the lower court to consider once this judgment became final.[5] See § 45.031, Fla. Stat. (2012) (governing judicial sales procedure); § 45.0315, Fla. Stat. (2012) (governing the right of redemption); § 45.032, Fla. Stat. (2012) (governing disbursement of surplus funds following a judicial sale); § 45.033, Fla. Stat. (2012) (governing the sale or assignment of rights to surplus funds in property subject to foreclosure); § 45.034, Fla. Stat. (2012) (governing qualifications and appointment of a surplus trustee in foreclosure actions); § 45.035, Fla. Stat. (2012) (governing clerk’s fees in judicial sales). In sum, the court below should never have considered Vargas’ motions to compel or to enforce this nonexistent agreement because it was without authority to grant him the relief requested. He was, therefore, entitled to no relief below and is entitled to no relief here.
Second, the order must be affirmed because, as the general magistrate aptly found, there is no evidence that the parties ever reached a binding agreement. See Ward v. Dones, 90 So.3d 826 (Fla. 3d DCA 2012) (“[T]he trial court is bound by the general [magistrate's factual findings unless they are not supported by competent substantial evidence.” (quoting Robinson v. Robinson, 928 So.2d 360, 362 (Fla. 3d DCA 2006))). Deutsche Bank’s servicing agent, Ocwen, offered to modify Vargas’ loan before a scheduled foreclosure sale date. That offer was conveyed by a cover letter, dated October 1, 2008, which clearly and unequivocally explained that Vargas qualified for a “specialized initiative program” which was only available for a limited time. The letter twice informed Vargas that he needed to “ACT NOW” and that the initiative program “ends October 24, 2008.” The attached loan modification agreement, also dated October 1, 2008, among other things, increased the principal amount of the loan to almost $268,000[6]; required Vargas to waive any and all claims against Ocwen/Deutsche Bank; and mandated acceptance of its terms by making an initial payment by October 24, 2008. Vargas intentionally allowed the loan modification offer to expire without making an initial payment by October 24th, the time at *1167 which the “specialized initiative program” ended.
Under basic contract law, after the loan modification offer expired, nothing existed for Vargas to accept. See Sullivan v. Econ. Research Props., 455 So.2d 630, 631 (Fla. 5th DCA 1984) (“There can be no question that when an offer is made for a time limited in the offer itself, no acceptance afterwards will make it binding. Any offer without consideration may be withdrawn at any time before acceptance; and an offer which in its terms limits the time of acceptance is withdrawn by the expiration of the time, (quoting Waterman v. Banks, 144 U.S. 394, 402, 12 S.Ct. 646, 36 L.Ed. 479 (1892))); Weiner v. Tenenbaum, 452 So.2d 986, 987 (Fla. 3d DCA 1984) (“The communication required in order to effect acceptance of an offer to buy is not satisfied where the document which constitutes the sole means of acceptance is still in the hands of the [offeree] after the time for acceptance has expired.”). And, even if there had been no time limit for acceptance thereof, Vargas twice made an outright rejection of the offer in his two “Motion[s] to Stay Foreclosure Sale and to Compel Reasonable Forbearance Agreement,” wherein he asserted that he could not “enter in to such an agreement unless modifications are made to the unreasonable terms contained therein.” See Ribich v. Evergreen Sales & Serv., Inc., 784 So.2d 1201, 1202 (Fla. 2d DCA 2001) (stating that “an acceptance of an offer must be absolute and unconditional, identical with the terms of the offer and in the mode, at the place and within the time expressly or impliedly required by the offer”).
Yet, Vargas claims that when he appeared at the January 29, 2009 hearing on his second post-judgment motion to compel, he and Deutsche Bank agreed to go through with the October 1st loan modification agreement, leaving open only the issue of when to apply his first payment. Not only is this claim unsupported by any evidence, as the general magistrate found, it also makes no sense.
The only testimony on this issue came from Vargas, who testified that on January 29th, “he” agreed to accept, and accepted, the previously rejected October 1st loan modification offer; that based on his agreement, he understood that the loan would be modified as per the October 1st agreement from January 29th forward; and that, based on that understanding, he and his attorney struck through that portion of the October 1st offer mandating acceptance as of October 24, 2008. While this may prove that on January 29th (with the February 12th foreclosure sale looming) Vargas finally decided to accept the offer he had previously rejected, it does not prove that Deutsche Bank agreed to or was bound by any such deal. To the contrary, by January 29, 2009, the October 1, 2008 offer to modify Vargas’ loan had long expired and there is no evidence that on January 29th Deutsche Bank or Ocwen agreed to re-assert that offer. There certainly is no evidence that Deutsche Bank or Ocwen was willing to modify its loan as of January 29th for either the same principal amount as that offered in October of the prior year (especially given that additional interest had been accruing since the October 1st offer was made), or on the same terms as those detailed in the original offer (given that the “special initiative program” on which the October 1st offer was premised had ended).
That Vargas had started making payments to Ocwen only days before securing a bankruptcy stay of the foreclosure sale also does not prove that an agreement existed. To the contrary, as the general magistrate found, the record shows, at best, that Ocwen initially accepted some checks from a borrower who owed it a *1168 substantial amount of money; that Ocwen returned some of these checks at once; and that, after the bankruptcy proceeding ended, Owcen returned all of these payments. And, other than self-serving statements set forth by Vargas’ counsel in letters to Ocwen — letters which were not copied to counsel for Deutsche Bank, the actual party in this foreclosure proceeding — there is no evidence that Ocwen or the bank ever knew about, much less agreed to, a new loan modification agreement. On this record, the magistrate and the court below were correct in concluding that no meeting of the minds had occurred and in rejecting Vargas’ unsupported argument that a loan modification agreement was reached at the January 29th hearing.
The order on appeal must be affirmed for yet a third reason: the applicable statute of frauds. Section 687.0304(2) of the Florida Statutes (2012) expressly provides that a “debtor may not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor.”[7] For the purposes of this statute, a credit agreement is defined as “an agreement to lend or forbear repayment of money ..., to otherwise extend credit, or to make any other financial accommodation.” § 687.0304(l)(a), Fla. Stat. (2012). The loan modification agreement at issue here is both an agreement which extends credit and which makes a financial accommodation. See Brake v. Wells Fargo Fin. Sys. Fla., Inc., No. 8:10-cv-338-T-33TGW, 2011 WL 6719215, at *7 (M.D.Fla. Dee.5, 2011) (confirming that an oral promise to modify a “mortgage loan on more favorable terms is a credit agreement subject to Florida’s banking statute of frauds because it is an agreement to make a financial accommodation. § 687.0304(1), (2), Fla. Stat.”); Fenn v. Litton Loan Servicing LP, No. 6:10-cv-965-Orl-28DAB, 2010 WL 8318866, at *2 (MD.Fla. Dec.10, 2010) (stating that a loan modification agreement is an agreement “to lend money and extend credit” under section 687.0304); Brisbin v. Aurora Loan Servs., LLC, 679 F.3d 748 (8th Cir.2012) (rejecting the notion that a promise to postpone a foreclosure sale is not a “financial accommodation” within the meaning of Minnesota’s credit agreement statute of frauds[8]). Be *1169 cause the alleged January 29th agreement is not signed by Deutsche Bank or Ocwen, it cannot be enforced.
Likewise, Vargas’ unilateral partial performance of what he contends was a loan modification agreement between the parties will not remove it from the statute of frauds in this case so as to make it enforceable. Even in those instances where partial performance has been found to remove an oral contract from the statute of frauds — an issue which need not be decided in this case — the acts done in furtherance of partial performance must be referable exclusively to the oral contract sought to be enforced and nothing else:
The rule is that in addition to establishing the oral contract under which the vendee claims, the acts claimed to have been done thereunder in order to meet the Statute of Frauds must be referable exclusively to the contract; the act or conduct relied on as constituting part performance of the contract must have special reference to it and nothing else.
Miller v. Murray, 68 So.2d 594, 596 (Fla.1953); Elliott v. Timmons, 519 So.2d 671, 672 (Fla. 1st DCA1988).
Here, all documentary evidence in the record indicates that the loan number assigned to the subject loan remained the same at all relevant times. The same loan number appeared on all of the documents evidencing Vargas’ original loan; the same loan number appeared on all of the documents related to the October 2008 modification offer which Vargas allegedly accepted; and significantly, the same loan number appeared on all of the checks that Vargas remitted toward payment of the purportedly modified loan. Thus, the remittance made by Vargas following the January 29th hearing could not refer exclusively to the modification- agreement as alleged. Rather, the evidence is that the remitted checks pertained to the existing note and mortgage that had been foreclosed, as evidenced by Ocwen’s multiple letters returning Vargas’ payments stating that “[t]hese funds are being returned, as they are not sufficient to satisfy the reinstatement of your account”; that “[t]hese funds are being returned, as they are not sufficient to satisfy the defaulted amount of your loan and no alternative payment arrangements have been agreed to”; and that “payments that are less than the amount required to reinstate the mortgage loan will be returned and will not stop any foreclosure proceedinys that have begun.” (Emphasis added).
For these reasons, we find that the trial court did not abuse its discretion in affirming the magistrate’s report and recommendation and affirm the order on appeal.
LAGOA, J., concurs.

. The note and mortgage are currently owned and held by Deutsche Bank National Trust Company. No issue has been raised here regarding Deutsche Bank’s entitlement to collect on the debt or to foreclose the mortgage at issue.

. Vargas' first defense was that his monthly payments had been misapplied and that he was not in "arrears to the extent alleged”; his second defense was that the note at issue was not attached to the complaint; his third defense was that a deficiency judgment could not be entered because the value of the property exceeded the amount due; and his fourth defense was that all conditions precedent to collection on the note and foreclosure of the mortgage had not been satisfied. These defenses apparently were abandoned below and have not been asserted here.

. There is no such provision in the final judgment of foreclosure or any other order in the record before us.

. The general magistrate made this finding in her report and recommendation, and Vargas does not challenge it. See Edge v. Edge, 69 So.3d 348, 349 (Fla. 3d DCA 2011) ("Findings for which a timely exception has not been lodged are deemed waived.”).

. No appeal was prosecuted from the final judgment of foreclosure.

. As nearly as we may discern, the principal amount stated in the modification agreement is comprised of the final judgment grand total, $248,840.88, plus interest and costs from the date of the judgment through October 24, 2008.

. At the hearing before the general magistrate, Deutsche Bank's counsel argued that the oral agreement suggested by Vargas was a "modification of a mortgage on real property” that "has to be in writing.” The general magistrate’s report and recommendation similarly stated that "there is no evidence of a meeting of the minds upon an agreement to modify the Defendants’ loan, either orally (under circumstances which require modification of the loan agreement in writing) or in writing.” Beyond these statements, it does not appear that section 687.0304 was expressly mentioned or considered in the lower proceedings. Even if not, we nonetheless may consider it here. See Dade Cnty. Sch. Bd. v. Radio Station WQBA, 731 So.2d 638, 644 (Fla.1999) (finding that "if a trial court reaches the right result, but for the wrong reasons, it will be upheld if there is any basis which would support the judgment in the record.”); see also Shands Teaching Hosp. & Clinics, Inc. v. Mercury Ins. Co. of Fla., 97 So.3d 204 (Fla.2012) (”[A]n appellate court should affirm a trial court that 'reaches the right result, but for the wrong reasons' if there is 'support for the alternative theory or principle of law in the record before the trial court’ ” (quoting Robertson v. State, 829 So.2d 901, 906-07 (Fla.2002))); State Farm Mut. Auto. Ins. Co. v. Curran, 83 So.3d 793, 795 n. 1 (Fla. 5th DCA 2011) ("We may affirm the trial court under the ‘tipsy coachman’ doctrine even where the lower court's reasoning is incorrect or when the basis of our affirmance was not argued.”).

. Florida’s banking statute of frauds is based on Minnesota’s credit agreement statute of frauds. See Brenowitz v. Cent. Nat'l Bank, 597 So.2d 340, 342 (Fla. 2d DCA 1992). Minnesota's statute similarly provides that "a debtor may not maintain an action on a credit *1169 agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor." Minn.Stat. § 513.33, subdiv. 2(2012).